In the Matter of the DENIAL OF EL-
LER MEDIA COMPANY'S APPLI-
CATIONS FOR OUTDOOR ADVER-
TISING DEVICE PERMITS IN the
CITY OF MOUNDS VIEW, Minneso-
ta.

Nos. C0–01–1695, C5–01–1708.

Supreme Court of Minnesota.

July 3, 2003.

Amy V. Kvalseth, Assistant Attorney General, Saint Paul, for Appellant.

Marvin A. Liszt, Bernick and Lifson, P.A., Karen R. Cole, Kennedy & Graven, Chartered, Minneapolis, for Respondents.

## OPINION

BLATZ, Chief Justice.

Appellant Minnesota Department of Transportation denied Respondent Eller Media Company's application for six permits to construct revenue-generating billboards on a municipally owned golf course in the City of Mounds View. The denial was based on a determination that the locations requested were not suitable under the Minnesota Outdoor Advertising Control Act. Following a contested case hearing, an administrative law judge reversed that determination and recommended issuance of the permits. Pursuant to Minn.Stat. § 14.63 (2002), the Minnesota Department of Transportation (MNDOT) filed exceptions to that decision, and all parties requested oral argument before the Commissioner of MNDOT (commissioner). The commissioner denied the application for permits.[1] Eller Media

---

1. Here, the deputy commissioner was acting on behalf of the commissioner and will be

and Mounds View appealed, and the court of appeals reversed and directed MNDOT to issue the requested permits. Because we conclude that the commissioner's denial was supported by substantial evidence, we reverse the court of appeals and reinstate the commissioner's findings of fact, conclusions of law, and order denying the permits.

In 1982, Mounds View adopted a comprehensive zoning plan. The comprehensive plan did not allow for billboards in any of the city's zoning districts. In 1984, the large majority of city-owned property was rezoned into Public Facilities (PF) districts. As defined by Mounds View, the purpose of a PF district was "to provide for land areas, waterways and water areas owned, controlled, regulated, used or proposed to be used by the City." Mounds View, Minn., Mounds View Zoning Code § 1118.01 (2000). Permitted uses in the district were limited to:

- ☐ public buildings and uses
- ☐ public parks, playgrounds, athletic fields, parking areas, and golf courses
- ☐ public sewers, water lines and water storage areas
- ☐ public streets, easements and other public ways, highways and thoroughfares
- ☐ treatment and pumping facilities and other public utility and public service facilities.

*Id.* at § 1118.02. A portion of city-owned property that would later become part of the golf course inadvertently remained zoned "Industrial" (I).

In 1988, the State of Minnesota conveyed land to the City of Mounds View via a quitclaim deed. The deed contained a provision that the property deeded would revert to the state if it was not used by Mounds View for a public purpose. At the time the land was conveyed, the state property was zoned as a Conservancy, Recreation, and Preservation (CRP) district. On this property Mounds View opened a municipal golf course, The Bridges, in 1995. The property was located north of Highway 10 and was financed by a revenue bond in the amount of $3,090,000. Although the golf course was profitable, it was unable to make its full debt payment in 1998 and 1999, necessitating the use of general fund revenue to supplement golf course revenue.

As established in the record, when The Bridges was developed it was similar to for-profit golf courses in Minnesota. Its golf fees were equal to or higher than comparable area golf courses and it was advertised as a "scenic executive length course in [a] nature park setting." Pictures included in the advertisements typically showed picturesque tree-lined views and one of the signature bridges giving the course its name. One of the main purposes of the golf course, as adduced by the ALJ at the contested case proceeding, was to be a revenue producer for Mounds View. Golf course revenues were kept separate from general city funds.

Following difficulty with making bond payments solely from golf course revenue, Mounds View began consideration of whether to allow billboards on the golf course. The Mounds View City Council first discussed this possibility at the March 8, 1999 city council meeting. The minutes of that meeting note that revenue from the billboards could offset the bond payments

referred to as the commissioner throughout this opinion. Pursuant to Minn.Stat. § 15.06, subd. 7, a deputy commissioner of MNDOT has "all the powers and authority of the commissioner unless the commissioner directs otherwise, and shall speak for the commissioner within and without the department or agency." Minn.Stat. § 15.06, subd. 7 (2002).

and reflect the city council's view that "some type of zoning action from the planning commission would likely be necessary" to allow billboards on the golf course property.

At the May 10, 1999 city council meeting, one council member mistakenly reported that the golf course was in a PF district rather than its correct location, a CRP district. The city council minutes note that the PF district "requires a MNDOT permit to erect billboards [b]ut generally, MNDOT only approves permits if located in a commercial or industrial district. So a Code amendment would be needed to obtain a permit from MNDOT."

Several months later, at the September 13, 1999 meeting, a member of the planning commission reported that the planning commission had researched the billboard proposal. The planning commission discovered that Mounds View's current sign code did not allow any signage within the PF or CRP districts. In apparent response to the planning commission's concerns, the Mounds View City Attorney stated that if the code was amended, the city could place billboards on the golf course and still remain within the "public purpose" restriction of the granting deed. Finally, one council member stated that any ordinance allowing billboards should include a provision for the removal of the billboards once the bonds were paid off.

In order to facilitate the placement of billboards on the golf course property, a series of ordinances were introduced to amend the city code. On September 13, 1999, Mounds View had a public hearing and first reading of Ordinance 637. Ordinance 637 sought to amend the city code to allow signage, including billboards, within the CRP and PF zoning districts. Similarly, the first reading of Ordinance 644, which created a limited-use district along Highway 10 where billboards would be permitted, occurred at a November 22, 1999 meeting. In discussing this second proposed ordinance, a planning commission member stated that portions of the golf course were zoned CRP and PF, and the current ordinance would not allow *any* signage in those districts. He further noted that billboards were not allowed in any district in Mounds View [2] and that the planning commission had unanimously approved a resolution recommending that the city council deny Ordinance 644 for the following reasons:

1. Large billboard signs are not appropriate uses of property within CRP and PF zoning districts. These districts are intended to provide recreational opportunities, open space and protect the natural environment where possible. Large advertising signs are not consistent with that intent and are more appropriate to commercial and industrial zoning districts.

2. Large billboard signs can be visually distractive * * *.

3. The City Attorney has advised city staff that the city cannot limit billboards to city-owned properties only.

4. A permit will be required from the State of Minnesota to locate billboards along state and federal highways. State statutes restrict such

2. While Mounds View does not allow billboards in any zoning district, it does allow smaller signs in various districts. For example, residential districts may contain small signs related to the sale or lease of property, business districts may have signs no greater than 100 square feet total, and light industrial districts may have a pedestal sign not larger than 340 square feet. As noted above, the CRP and PF districts do not allow for *any* signs.

signs to commercial and industrial zoning districts only. The contemplated sites for additional billboards are not zoned commercial or industrial.

The city council, recognizing that Mounds View was faced with "escalating bond payments," approved the first reading of Ordinance 644, creating the limited use district along Highway 10.

A second reading of the same ordinance, now amended to include an automatic termination date for the billboards at the bond payoff date, was approved at the December 13, 1999 meeting. Before voting for adoption of the ordinance, the mayor explained that the billboards were for "the specific purpose of raising additional revenues for the period of time during which the bonds are outstanding." Some city council members voiced concern about the existence of billboards after the bonds were paid off. In deference to the concern raised, the city attorney explained that the city council could allow billboards as an interim use only, and require that the use expire after fifteen years or upon the expiration of the lease, whichever occurred sooner. One council member spoke in opposition to the billboards, noting that Mounds View was "doing well in eliminating the billboard located on the Rent All facility on Highway 10, and the city was attempting to eliminate the billboard located across the street from City Hall."[3]

After the final approval of the limited-use ordinance, Mounds View solicited proposals for billboards on the golf course. In January 2000, Eller Media submitted a proposal to Mounds View and at the February 14 city council meeting, a motion passed to authorize staff to negotiate an agreement with Eller. At the same meeting, the city council again considered Ordinance No. 637. Ordinance No. 637, as originally introduced, proposed to permit billboards in the PF and CRP districts. During the course of the meeting, the ordinance was amended to allow billboards in Planned Unit Development (PUD) districts. The amendment was made at the urging of the city attorney, who advised that the addition of the PUD district was needed to ensure that Mounds View "was not singularly zoning one piece of property, in order to avoid concerns regarding 'spot zoning.'" In addition to Ordinance 637, Ordinance 644—which limited the billboards to the area north of Highway 10 where the golf course was located—was also finally adopted.

A third ordinance, No. 655, was discussed and adopted at the March 27, 2000 city council meeting. That ordinance rezoned the golf course from a mixture of I–1 (an industrial zone designation) and CRP zones to PF. The minutes of various city council meetings reflects that throughout the discussion regarding billboards, council members had been mistakenly assuming that at least a portion of the golf course was zoned PF in addition to the CRP.[4] This mistake required an ordinance that effectuated the rezoning of the golf course in its entirety to PF. Ordinance 655 expressly stated that Mounds View had determined that the previous "zoning classification of certain parcels associated with [T]he Bridges Golf Course [were] inconsis-

---

3. The record does not provide additional information on these billboards. Presumably, they were in existence prior to the passage of laws restricting such signage and, as such, were grandfathered in.

4. The genesis of this mistake appears to be rooted in the original rezoning of all city property to PF districts. This original rezoning apparently unintentionally omitted a piece of property upon which The Bridges became partially located and that was, at the time of rezoning, zoned I–1.

tent with the zoning code and the proposed Comprehensive Plan."

The city council minutes of March 27, 2000, reflect that council members discussed the outstanding debt on the golf course ($3.1 million) and the potential revenue from 15 years of billboards ($5 million). At that same meeting, the city council passed two additional ordinances authorizing Mounds View to require and to issue interim permits for billboards. The city council also approved an interim use permit for Eller Media's proposed billboards on the golf course.

In May 2000, Eller Media submitted six permit applications to Michael Constant, the MNDOT employee in charge of advertising control for the west metro area. The application requested permits for installation of billboards in the Mounds View PF district that now encompassed the whole of the golf course. On June 9, 2000, Constant denied Eller Media's applications for billboard permits on the basis that the proposed billboard locations did "not meet the requirements of the Minnesota Outdoor Advertising Control Act." No further explanation was given.

Eller Media challenged the denial of the permits in a contested case proceeding before an administrative law judge (ALJ). Mounds View formally intervened in the proceeding. In contrast to MNDOT's initial determination, the ALJ recommended that the permits be issued. The ALJ's report was submitted to the Commissioner of MNDOT. Following submission of arguments, the commissioner denied the permits on three separate legal bases: (1) the zoning actions undertaken by Mounds View were "spot zoning"—that is, done primarily to permit billboards, and were therefore not recognized as legitimate under 23 C.F.R. § 750.708(b); (2) to the extent that the operation of the municipal golf course could be considered commer-

cial, it was an incidental use of Mounds View's PF zone, and therefore the signs were barred under 23 C.F.R. § 750.708(d); and (3) the PF-zoned golf course area was not a "business area" under Minn.Stat. § 173.08, subd. 1(8) and § 173.02, subd. 17 (2002) and therefore billboards were not allowed under state law.

Eller and Mounds View appealed. The court of appeals held that the commissioner had erred and that the golf course area was indeed a business area under Minnesota's statutory scheme, and that MNDOT had misinterpreted federal law controlling billboards. *In re Eller Media Company's Applications for Outdoor Advertising Device Permits,* 642 N.W.2d 492, 500 (Minn. App.2002). Accordingly, the court of appeals directed MNDOT to issue the requested permits. *Id.* at 504. MNDOT petitioned this court for review.

This case presents us with the issue of whether a municipally owned golf course located in a public facilities zone can be considered a "business area"—a district most appropriate for commerce or industry—under Minn.Stat. § 173.08, subd. 1(8). Here, although the ALJ decided that the public facilities district was a business area, the commissioner concluded that it was not.

A. Standard of Review

■ Review of agency decisions following a contested case hearing is governed by Minn.Stat. § 14.69 (2002). The ALJ's report is ordinarily not binding on the agency. *City of Moorhead v. Minnesota Pub. Utils. Comm'n,* 343 N.W.2d 843, 847 (Minn.1984) (quoting *Hymanson v. City of St. Paul,* 329 N.W.2d 324, 326–27 (Minn. 1983)). Although the decision of the ALJ is entitled to some weight, the ALJ is subordinate to the agency. *Id.* As an ALJ takes no power away from the agency, the

agency has the authority to reverse factual determinations made by an ALJ. *Id.*

 Upon review, our court must exercise judicial restraint, lest we substitute our judgment for that of the agency. *In re Excess Surplus Status of Blue Cross and Blue Shield of Minnesota,* 624 N.W.2d 264, 277 (Minn.2001) (citation omitted). We will not disturb an agency's decision as long as the agency's determination has adequate support in the record as required by the substantial evidence test. *See City of Moorhead,* 343 N.W.2d at 847. The substantial evidence test is satisfied when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matter of Request of Interstate Power Co. for Authority to Change its Rates for Gas Service in Minnesota,* 574 N.W.2d 408, 415 (Minn. 1998) (citation omitted). We retain the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute. *See St. Otto's Home v. Minn. Dept. of Human Services,* 437 N.W.2d 35, 39–40 (Minn.1989).

B. The Federal Highway Beautification Act and Minnesota's Outdoor Advertising Act

The Federal Highway Beautification Act (FHBA) provides for control of the installation and maintenance of outdoor advertising signs in areas adjacent to the interstate and primary highway systems. 23 U.S.C. § 131(a) (2000). The purposes of the FHBA are to protect the public investment in highways, to promote the safety and recreational value of public travel, and to preserve natural beauty. *Id.* The Minnesota Outdoor Advertising Control Act, Minn.Stat. § 173 (Minnesota Act), is

similarly designed to accomplish the purposes set forth in the FHBA and to bring the state in compliance with federal law. Minn.Stat. § 173.01 (2002). The Minnesota Act restricts outdoor advertising devices to those areas where "business and commercial activities are conducted." *Id.* Thus, relevant to our analysis in this case is the following definition of a business area, set forth in section 173.02, subd. 17: "[A]ny part of an adjacent area which is (a) zoned for business, industrial, or commercial activities * * *." Minn.Stat. § 173.02, subd. 17 (2002).

The Minnesota Act also requires the commissioner to comply with federal law, rules, and regulations relating to billboard control. Minn.Stat. § 173.185 (2002).[5] Accordingly, Minnesota's laws are interpreted in conjunction with the federal laws they were enacted to implement. The FHBA defines commercial and industrial zones as "those districts established by the zoning authorities as being most appropriate for commerce, industry, or trade, regardless of how labeled." 23 C.F.R. § 750.703(a). It also prohibits what is commonly termed "spot zoning," or zoning that is not part of a comprehensive zoning plan and is done primarily to permit outdoor advertising. 23 C.F.R. § 750.708(a). Further, the FHBA makes clear that if a zone is one in which limited commercial or industrial activities are permitted merely as incidental to a primary, noncommercial/industrial land use, the zone will not be considered a commercial or industrial zone for outdoor advertising control purposes. 23 C.F.R. § 750.708(d). Aside from these limitations, the States retain full authority to zone areas for commercial or industrial purposes. 23 U.S.C. § 131(d).

---

5. Minnesota Statute § 173.185 reads, in relevant part: "The commissioner of transportation shall comply with federal law and federal rules and regulations relating to billboard control on the interstate and primary systems * * *."

C. Zoning and the City of Mounds View's Comprehensive Plan

■ A zoning statute or ordinance is one which, by definition, regulates the building development and uses of property. *Orme v. Atlas Gas & Oil Co.*, 217 Minn. 27, 13 N.W.2d 757, 761 (1944). Municipalities use zoning to regulate land use particularly because it is impractical to deal with each use made of land and buildings. *McQuillin Mun Corp* § 25.07 (3rd ed.2000). Therefore, the creation of districts or zones and the classification of those districts is a vital part of any zoning plan. *See State ex rel. Berndt v. Iten*, 259 Minn. 77, 81, 106 N.W.2d 366, 369 (1960) (citations omitted). These districts serve the paramount purpose of encouraging the most appropriate use of land. *See Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (noting no serious difference of opinion exists regarding validity of laws designed to minimize dangers of fire, overcrowding, and collapse, and necessity of excluding offensive trades from residential districts); *Iten*, 106 N.W.2d at 369 (observing that it is not unreasonable for a legislative body to assume that separation of the commercial and residential areas would insure better use of municipal services) (citation omitted).

■ Mounds View's comprehensive plan creates a number of districts, including several business districts, a CRP district, a PF district, and others not relevant to our consideration here. In establishing such districts, Mounds View executed the policies and goals underlying its comprehensive land plan. *See SuperAmerica Group, Inc., a Div. of Ashland Oil, Inc. v. City of Little Canada*, 539 N.W.2d 264, 266–67 (Minn.App.1995); Minn.Stat. § 462.357, subd. 1 (2002). The various sections of the comprehensive plan are to be construed together, as they relate to the same subject matter and to each other. *Chanhassen Estates Residents Ass'n v. City of Chanhassen*, 342 N.W.2d 335, 339 (Minn. 1984).

Mounds View's designation of business and commercial districts and the uses assigned therein must be viewed with an eye toward the federal and state laws prohibiting the placement of billboards in areas not considered primarily business or commercial in nature. Here, Mounds View has established several types of business districts, allowing such diverse uses as grocery stores, motels, restaurants, boat sales, bowling alleys, and department stores. Mounds View's comprehensive plan states that the purpose of the business districts is to provide for the establishment of various types of commercial and service activities.

■ In contrast, Mounds View's comprehensive plan establishes that in the PF district, where the golf course is located, only the following uses are permitted:

- public buildings and uses
- public parks, playgrounds, athletic fields, parking areas, and golf courses
- public sewers, water lines, and water storage areas
- public streets, easements, and other public ways, highways, and thoroughfares
- treatment and pumping facilities and other public utility and public service facilities.

Further, unlike the business districts, the PF district has an explicitly stated public purpose: to provide for land areas, waterways, and water areas owned, regulated, or controlled by the city. Distinctions between municipal and private property are a reasonable basis for zoning districts. *See McCarter v. Beckwith*, 247 A.D. 289, 285 N.Y.S. 151, 154 (1936); *McQuillin Mun Corp* § 25.123 (3rd. ed.2000).

■ Eller Media and Mounds View argue, correctly, that municipalities are statutorily authorized to engage in proprietary activities. *See, e.g., Southern Minnesota Mun. Power Agency v. Boyne* 578 N.W.2d 362, 364–65 (Minn.1998) (holding that legislature granted a municipal entity authority to run a utility like a private corporation). They further contend that a wide variety of activities are conducted in the PF zone, including operation of a water treatment plant, a city office complex, a water tower and golf course. This fact, in conjunction with the fact that the properties surrounding the golf course are in districts zoned industrial, warehouse, or office park, lead Eller Media and Mounds View to the conclusion that the PF district is zoned for business or commercial activities within the meaning of Minn.Stat. § 173.02, subd. 9. Finally, they contend that the PF zone is a district established as "most appropriate for commerce, industry, or trade" within the meaning of 23 C.F.R. § 750.703(a).

■ In drawing these conclusions, it is apparent that Eller Media and Mounds View rely on the uses of the area *surrounding* the PF district to inform their argument as to what should be allowed within the PF district. There is simply no support in zoning law for such a contention. Similar characteristics in adjacent and surrounding areas do not require that adjoining territories be zoned the same. *Lockard v. City of Los Angeles,* 33 Cal.2d 453, 202 P.2d 38, 45 (1949); *cf. Geneva Inv. Co. v. City of St. Louis,* 87 F.2d 83, 91 (8th Cir.1937) (holding that

property in restricted area adjoining property in less-restricted area did not render the ordinance invalid), *cert. denied* 301 U.S. 692, 57 S.Ct. 795, 81 L.Ed. 1348 (1937). Attenuating their argument even further is the fact that much of the area that Mounds View and Eller Media direct us to consider is located in the City of Blaine, not Mounds View. As such, its character and zoning cannot be considered as relevant here, particularly as Mounds View would have had no authority to direct the zoning in a neighboring community. *See, e.g. Cummings v. Lawson,* 28 Or.App. 573, 559 P.2d 1316, 1317 (1977) (regarding zoning, any act by city beyond its jurisdiction has no effect and does not preclude other governmental bodies from exercising jurisdiction over the project). To conclude otherwise would eviscerate the very power given to elected municipal officials to govern within their jurisdiction and could create a domino effect with one governing body's decisions affecting the zoning decisions in neighboring communities. This is neither the law nor sound public policy.

Finally, the mere fact that under Mounds View's zoning scheme golf courses are permitted uses in both the PF and business districts does not render the PF district a commercial district.[6] Indeed, golf courses are permitted in *residential* districts of most municipalities. *See* 3 Kenneth H. Young, *Anderson's American Law of Zoning* § 17.30 (4th rev. ed.1996). For example, the city of New York permits golf courses in both residential and commercial zones. *Id.* That golf courses and residential homes may be compatible uses

---

6. Minnesota Statute § 173.02, subd. 17 defines a business area as one "zoned for business, industrial, or commercial activities." The legislature's concern that a location be "zoned" for commerce plainly contemplates that there is, or realistically will be, sufficient commerce such that a local government would take steps to zone it accordingly, there-

by providing for commercial development as a matter of right. Viewing the city's proprietary activity on an isolated parcel of city property located in a public facilities zone as commercial zoning is clearly inconsistent not only with the outdoor advertising control law but also with the city's comprehensive plan.

in a residential district does not support a conclusion that a residential district is a district zoned as "most appropriate" for commerce. This, however, is the analytical approach that is being urged upon our court in reference to Mounds View's PF district.[7]

In summary, we are cognizant that the overriding purpose of land use in Mounds View's PF districts is the public character of the land use and dedication to public needs and access. The commissioner recognized as much in finding that the PF zone was not a business area, noting that merely by creating a PF district separate and distinct from that of commercial zones, "the city has recognized a difference between areas zoned for business and areas zoned for public purposes." In the commissioner's view, Mounds View "clearly knew how to zone for business, commercial and industrial areas and had specifically done so" in its comprehensive plan.

Accordingly, we presume that the comprehensive plan reflects the underlying policies and goals of the City of Mounds View. We further read the comprehensive plan and give each zoning district meaning.

When we do so, it is clear that, by specifically designating a public facilities zone, Mounds View intended to make that district distinct from its business district. As such, the contention that the PF zone is "most appropriate" for business fails. Indeed, Mounds View's and Eller Media's attempt to frame the PF zone as a "business area" also fails under the Minnesota "zoned for business, industrial, or commercial activities" test.[8]

For the foregoing reasons, we reverse the decision of the court of appeals and hold that Mounds View's public facilities district, a district that by definition designates municipal land for public use, can be considered neither a "business area" under Minnesota law nor a district "most appropriate for commerce, industry, or trade" under federal law. It is thus impermissible for Mounds View to place billboards upon the golf course property located in the public facilities zone.

Reversed.

HANSON, Justice (dissenting).

I respectfully dissent. The City's proposal to place revenue-generating bill-

---

7. We are troubled by the dissent's concern that comprehensive plans that allow for parklands, golf courses, and open spaces in areas surrounded by businesses would compromise the goal of "utility in commercial and industrial areas." Governing bodies have the right to meet the desires of their citizens for beauty and space—even in cities. To suggest otherwise is not only alarming but ignores the recent trend in municipal land use development. *See, e.g.,* John T. Marshall, *The Property Rights Movement and Historic Preservation in Florida: The Impact of the Bert J. Harris, Jr. Private Property Protection Act,* 8 U. Fla. J.L. & Pub. Pol'y 283, 304 (1997) (discussing amendments to Florida's comprehensive plan and noting that municipalities must ensure protection for natural resources, fight urban sprawl, and include a "future land use plan" sympathetic to both artificial and natural surroundings).

8. We are also not persuaded by Mounds View's and Eller Media's two arguments that because MNDOT permits have been issued to other governmental agencies and for a billboard located on a golf course located in the PF zone in the City of Eagan, a permit should issue here. First, the issue is not whether a governmental agency can be given a billboard permit. Rather, it is whether the zoning district properly allows for billboards. Secondly, the legality of the Eagan permit was never litigated and therefore never before an appellate court for review. Further, as set forth in MNDOT's brief, the uses allowed in Eagan's PF zone are different than those allowed in Mounds View's PF zone. Finally, MNDOT has acknowledged that the Eagan permit may have been improvidently issued.

boards adjacent to Highway 10 on The Bridges Golf Course is an innovative solution to serious budgetary concerns. It appears to have been chosen after due consideration of all relevant policy interests, including those of highway convenience, safety and beautification. Because municipalities have the authority to allow billboards within their boundaries, except as restricted by federal and state law, I would conclude as a matter of law that (1) a public golf course that is operated to make a profit is a "business," whether owned by a private entity or a municipality; (2) a municipally owned golf course that has been zoned PF meets the federal criteria for permitting the erection of billboards in areas that are "zoned industrial or commercial under authority of state law;" and (3) such a course also meets the state criteria for the erection of billboards in "business areas."

*Standards of Review*

In arriving at these conclusions, I did not consider it necessary or appropriate to give deference to the conclusions of the Commissioner of MNDOT. Although the standard of review applicable to fact questions decided by an administrative agency is one of substantial evidence, there does not appear to be any dispute on the underlying facts. The pertinent standards of review thus are those that authorize the reversal of an agency's decision if it is "in excess of the statutory authority or jurisdiction of the agency" or "affected by other error of law." Minn.Stat. § 14.69(b), (d) (2002). Generally, this court independently reviews questions of law, such as matters of statutory interpretation, and, in considering such questions, need not defer to the expertise of the agency. *See, e.g., Arvig Tel. Co. v. Northwestern Bell Tel. Co.*, 270 N.W.2d 111, 114 (Minn.1978); *St. Otto's Home v. Minnesota Dep't of Human Serv.*, 437 N.W.2d 35, 39–40 (Minn. 1989).

Moreover, there is no basis in this record to conclude that the critical questions presented here—whether a municipal golf course is a "business," is within a "business area" or is within a district "most appropriate for commerce, industry, or trade"—are ones that call on the Commissioner's special knowledge or expertise. In fact, MNDOT has been inconsistent in its rulings on sign permits sought by governmental bodies. It has granted permits for property owned by the Minneapolis Community Development Agency, the MTC Company, the Minnesota State Fair Board, and the Metropolitan Airports Commission, among others. And, it has interpreted state and federal law to permit billboards on the Lost Spur Golf Course in Eagan, Minnesota, which is also zoned as a PF.

### A. Federal and State Regulation of the Location of Billboards

The tenor of the Commissioner's decision is that federal and state laws strictly prohibit the placement of billboards, with only narrow exceptions that are within the Commissioner's discretion. This is not my view of the law. Federal and state billboard laws provide reasonable, not strict, regulation of the location of billboards. Those laws value both the need for highway safety and beautification and the legitimate role of billboards in our economy. They specifically permit billboards to be located in appropriate areas and they grant discretion to local zoning authorities, not to the Commissioner.

#### 1. The Federal Highway Beautification Act

Federal law is focused on the regulation, not the prohibition, of billboards. While the purpose of the FHBA is "to protect the public investment in such highways, to

promote the safety and recreational value of public travel, and to preserve natural beauty," the mechanism chosen by Congress was not to directly control the erection of billboards, but to provide incentives to the states by conditioning the payment of ten percent of a state's share of federal-aid highway funds on that state's exercise of its powers to effectively control the erection of billboards. 23 U.S.C. § 131(a), (b) (2000). A state is deemed to have exercised effective control so long as it restricts the erection of billboards to adjacent areas that are "zoned industrial or commercial under [the] authority of State law." *Id.* § 131(d). Policies adopted by the Federal Highway Administration, pursuant to the FHBA, provide that an adjacent area is considered to have been zoned commercial and industrial if it is within a district that is "most appropriate for commerce, industry, or trade, regardless of how labeled." 23 C.F.R. § 750.703(a) (2003).

I conclude from this that the federal government is not concerned with the individual actions of municipalities allowing or denying the erection of billboards, but only with the systems implemented by states to regulate the erection of billboards. Further, although a state regulatory system could lawfully be more restrictive than that specified by federal law, the federal law makes it clear that a state will not forfeit federal-aid highway funds by allowing billboards in zoning districts that are "appropriate for commerce, industry or trade." Finally, the federal law instructs that states are not to focus on the zoning labels used to describe a district, but upon its appropriate use for commercial, industrial or trade purposes. Specifically, the policies of the Federal Highway Administration support the view that the use of the PF zoning label does not determine whether a municipal golf course satisfies the federal criteria for the erection of bill-

boards. Indeed, MNDOT's grant of the permit to the Lost Spur Golf Course demonstrates that the PF label is not fatal.

### 2. The Minnesota Outdoor Advertising Control Act

Minnesota's Act was enacted to comply with the terms of the FHBA, presumably to prevent any forfeiture of ten percent of federal-aid highway funding. Minn.Stat. ch. 173 (2002). Although Minnesota's declaration of policy essentially adopts the federal goals ("to promote the general welfare of the people and to conserve the natural beauty of areas adjacent to certain highways"), it also recognizes the positive contribution of billboards ("inasmuch as outdoor advertising is an integral part of the business and marketing function, an established segment of the national economy, and a legitimate commercial use of property adjacent to roads and highways, it should be allowed to operate where other business and commercial activities are conducted * * *"). Minn.Stat. § 173.01 (2002). To that end, Minnesota's regulation allows billboards to be located in "business areas." Minn.Stat. § 173.08, subd. 1(8) (2002). "Business areas" are defined to mean "any part of an adjacent area which is (a) zoned for business, industrial or commercial activities under the authority of any law of this state or any political subdivision thereof; `* * *`." Minn.Stat. § 173.02, subd. 17 (2002).

I conclude from this that Minnesota has recognized that the federal criteria for permitting billboards does not require that the zoning label be either "commercial" or "industrial." In fact, from Minnesota's broader statement of purpose, and its choice of the broad term "business areas," I infer the intent to (1) be as permissive as the federal criteria allows and (2) focus on the use of the property, not on its ownership.

There is no suggestion in this record that Minnesota's regulatory system, including its focus on "business areas," fails to provide "effective control of the erection and maintenance * * * of outdoor advertising signs," within the meaning of the FHBA. Accordingly, the precise question presented is whether the language by which the Minnesota legislature has exercised control of billboards permits the erection of billboards on a municipally owned golf course that has been zoned as a PF.

### B. The Bridges Golf Course is Operated as a Business

The Commissioner interpreted the term "zoned for business * * * or commercial activity" to be limited to activities conducted by private enterprises and to exclude all activities conducted by government, whether governmental or proprietary in nature. The court of appeals disagreed, holding that municipalities can engage in business activities and that The Bridges golf course qualifies as a business activity. *In re Eller Media Company's Applications for Outdoor Advertising Device Permits*, 642 N.W.2d 492, 500 (Minn.App. 2002). I agree with the court of appeals that the proper focus of the definition of business areas is on the use, not the ownership of the property. I also agree that the operation of The Bridges golf course, as conducted by the City in this case, is fully a business activity.

The majority opinion challenges these conclusions on essentially two grounds.

### 1. Does the Industrial Character of the Surrounding Area Matter?

The majority opinion suggests that the conclusion that the golf course is a "business area" can only be supported by relying on the business uses of the area surrounding the golf course. This mis-construes the City and Eller's argument, as I understand it. The argument, first and foremost, is that the golf course, viewed in isolation, is a business area that is only zoned PF because it is owned by the City. This argument turns not on the zoning or use of the surrounding area but on the activity of operating a public golf course—in this case a course that was created to generate revenue and is operated like a business for profit.

The references by the City and Eller to the surrounding area are largely in response to MNDOT's allegation that the City engaged in "spot zoning," which occurs when a zoning authority establishes a classification that is inconsistent with the surrounding uses and becomes an island of nonconforming use. *See, e.g., State v. City of Rochester,* 268 N.W.2d 885, 889–90 (Minn.1978). Thus, when MNDOT challenged the motives of the City in taking certain actions to permit billboards, and MNDOT alleged that those actions were inconsistent with the City's comprehensive zoning, the City and Eller responded that the treatment of The Bridges as a business area is completely consistent with the comprehensive zoning because all of the areas surrounding The Bridges, north of Highway 10, are zoned for business activity. In fact, the zoning history of the parcels that make up The Bridges suggests that the only reason they do not have commercial or industrial zoning labels, similar to the surrounding area, is because they are owned by the City. .

Although the record does not lay out that history with precision, it appears that the most westerly parcels of The Bridges were zoned industrial as part of the 1982 comprehensive zoning plan that zoned all property north of Highway 10 as industrial. These parcels retained that zoning label until the City adopted a comprehen-

sive rezoning ordinance in 1984, when it rezoned them to Public Facilities as part of a move to group all city-owned land in that classification.

The most easterly parcels of The Bridges were not zoned industrial in 1982 only because they were then owned by the state. This was undeveloped land that had been zoned as a Conservancy, Recreation and Preservation District. Those parcels were conveyed to the City in 1988 and eventually were rezoned to Public Facilities, again only because they were owned by the City.

A middle parcel had been zoned industrial while it was owned by Sysco Foods. When Sysco transferred it to the City in 1989, it was rezoned Public Facilities.

As a consequence, all zoning actions taken by the City with respect to The Bridges were either part of a comprehensive plan or were taken to conform to a comprehensive plan. MNDOT's allegation of spot or piecemeal zoning is unfounded, and the City and Eller's references to the zoning classifications of the surrounding area, as a defense to that allegation, was well taken.

Moreover, while it is true that the proper focus for determining "business areas" is the specific zoning district (in our case, the PF district), the business character of the surrounding area has some relevance to the public policy concerns that underlie the federal and state billboard laws. The broad goals of those laws are to permit billboards where they are compatible with the surrounding land use and preclude them where they are not. Essentially, they allow billboards in commercial and industrial areas, where utility is valued higher than beauty, and preclude them in residential and agricultural areas, where beauty is more highly valued than utility. Just as the goals of beautification in residential and agricultural areas would be violated by creating a commercial island in their midst (i.e. spot zoning), the goals of utility in commercial and industrial areas would be violated by creating a "governmental" island in their midst, where billboards are precluded on commercial property solely because it is owned by a municipality.

In that connection, MNDOT has permitted two billboards on the Sysco property on the north side of Highway 10, immediately west of The Bridges. Thus, a motorist who leaves I–35W to go west on Highway 10 will encounter billboards immediately after passing The Bridges. I fail to see how the policy of beautification is served by denying billboards in the small island of municipally owned land that lies boxed in between those billboards and I–35W.

## 2. Can a Municipally Owned Golf Course be a "Business?"

The majority concludes that the mere fact that golf courses are a permitted use in a business district does not necessarily make a golf course a business area. The majority notes that a golf course may also be a permitted use in a residential district. But this example does not demonstrate that a golf course is not a business. If the golf course in this example were separately zoned PF, as in our case, the residential zoning of the surrounding area would be irrelevant to the question of whether it is a business area because, as the majority stresses, that question only focuses on the single zoning district. If, on the other hand, the example assumes that the golf course is not separately zoned, but is a permitted use in a residential zone, this does not mean that the golf course is not a business. The question would be whether the primary use of the zone is residential. If it is, the business use of a part of the zone for a golf course would not satisfy the federal or state criteria because it would

only be incidental to the primary, residential use of the large zone. 23 C.F.R. § 750.708(d) (2003).

Where a municipally owned golf course is separately zoned, the question whether it qualifies as a business area should turn on whether it has the characteristics of a business. If it is provided to the citizens at less than cost, as part of a park system that is subsidized by taxes for the general welfare of the community, one could conclude that it is not a business area. But if, as our undisputed facts show, it is operated for a profit and only serves fee-paying customers, similar to any privately owned golf course, I would conclude that it is a business area.

Here, the City incurred bonded indebtedness of over $3 million to build The Bridges, installing over 20 miles of irrigation pipe, high maintenance turf, artificial ponds and a lighting system for the driving range. The Bridges generates revenue from the sale of the golf rounds and lessons, the sale of merchandise in the proshop and the sale of food and liquor in the clubhouse. The City's residents do not receive any discount for golf rounds. In fact, the rates are among the highest in the area for nine-hole golf courses. The City advertises the course and maintains loss-of-business insurance coverage. The Bridges generates annual revenue of about $800,000 and net income of $200,000 per year. These revenues are kept in an enterprise fund, separate from the general revenues of the City. In other words, The Bridges was created for business purposes, to generate revenue for the City; it is operated as a business, using the same business models as are used by privately owned, for-profit golf courses; it competes for customers with other golf-course businesses; and it charges customers at the high end of market rates. This satisfies the criteria for a business area.

### C. The Business Activities of The Bridges Make it a Business Area

The Commissioner's decision relies on zoning labels. If the City rezoned The Bridges to "commercial" or "industrial," this would not change the use of the property but would presumably satisfy the Commissioner's literal reliance on the "commercial or industrial" zoning labels to permit billboards. Conversely, the City's decision to place The Bridges in a PF zone was based on factors that have no relevance to the public policy concerns that underlie the billboard laws. It is a classification of convenience, that groups properties by ownership, irrespective of use. The billboard laws are indifferent to ownership. If the legislature had intended that governmental ownership would automatically disqualify property from being within a "business area," it could easily have said so. Instead, it defined "business areas" by relying on the activities conducted on the property, not on ownership.

I would affirm the decision of the court of appeals and direct MNDOT to issue the requested permits.

GILBERT, Justice, dissenting.

I join in the dissent of Justice Hanson.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent and, in doing so, join in most but not all of Justice Hanson's dissent. I do not read federal and state prohibitions on the placement of billboards as narrowly as Justice Hanson does, either explicitly or implicitly, in his dissent. Nor do I necessarily agree that what the City of Mounds View has done is an "innovative solution to serious budgetary concerns." Nevertheless, I agree that what the city has done is permitted under the law and that the commissioner's denial of the billboard permits was not supported by substantial evidence.

Justice Hanson properly concludes that the focus of the federal law is not on "labels" that are used to describe zoning districts, but rather is on the appropriate use of the land in the district. Further, Justice Hanson and the court of appeals correctly conclude, as articulated by Justice Hanson in his dissent, that the "proper focus of the definition of business areas is on the *use,* not the *ownership* of the property." (Emphasis added.)

When the facts of this case are viewed within the context of this properly-defined focus, there is no merit to the commissioner's assertion that Mounds View's action in granting the permits constitutes spot zoning that is inconsistent with its comprehensive zoning plan. The Bridges Golf Course is located in a triangular-shaped parcel of land bordered on the east by Interstate Highway 35W, on the southwest by U.S. Highway 10, and on the north by 85th Avenue N.E. While part of this triangular-shaped parcel is within the city limits of Blaine, the whole of the parcel consists of land bounded by major highways or streets, all of which is consistently used for commercial or business purposes. That Mounds View has chosen to place a nine-hole golf course in the middle of this commercial and industrial triangle does not so change its character that the construction of billboards is no longer possible because to do so would violate federal and state law.

For these reasons, I agree with the dissent's analysis and conclude that the action taken by Mounds View, whether one views it as good or bad policy, is permitted by law. Therefore, I would affirm the decision of the court of appeals and direct the commissioner to issue the requested permits.