*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1587**

In the Matter of the Expulsion of A.D. from
United South Central Public Schools No. 2134.

**Filed July 20, 2015
Reversed
Johnson, Judge**

Minnesota Department of Education

Andrea L. Jepsen, Amy J. Goetz, School Law Center, LLC, St. Paul, Minnesota (for relator A.D.)

Trevor S. Helmers, Elizabeth J. Vieira, Rupp, Anderson, Squires & Waldspurger, P.A., Minneapolis, Minnesota (for respondent United South Central Public School No. 2134)

Lori Swanson, Attorney General, Martha J. Casserly, Assistant Attorney General, St. Paul, Minnesota (for respondent Brenda Cassellius, commissioner of Department of Education)

Considered and decided by Peterson, Presiding Judge; Ross, Judge; and Johnson, Judge .

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

The United South Central School District suspended a student, A.D., after staff found a knife in her purse during a search of her locker. After an evidentiary hearing, the school board found that A.D. violated a school policy that forbids the possession of weapons on school property and that she engaged in conduct that endangered herself and

others. Based on those two findings, the school board expelled A.D. for the remainder of her junior year of high school, a period of approximately six weeks. The commissioner of education affirmed the expulsion. On appeal, A.D. argues that her expulsion violates the Pupil Fair Dismissal Act. We conclude that each of the bases for A.D.'s expulsion is improper. The first basis is improper because the school board did not find that A.D. *willfully* violated the applicable school policy when she carried the knife to school. The second basis is improper because the evidentiary record does not support the school board's finding that A.D. willfully engaged in conduct that endangered herself or others. Therefore, we reverse the expulsion.

**FACTS**

On the morning of Tuesday, April 15, 2014, members of the staff of United South Central High School, which is located in the city of Wells, conducted a random search for contraband. The school building was placed on lockdown status while a drug-sniffing dog walked past students' lockers. Students were required to remain in their classrooms. A dog alerted on A.D.'s locker. School liaison officer Rick Herman performed a search of the locker. He found a purse and, inside the purse, a three-inch-long "hunting-style pocketknife." Herman did not find any drugs in A.D.'s locker; he testified that the dog may have alerted on A.D.'s locker because of the strong odor of perfume.

Herman secured the knife in his office and informed the school's principal, Kelly Schlaak, of the results of his search. Schlaak called A.D. to her office. Schlaak asked A.D. whether she knew why she had been called to the principal's office; A.D. answered, "you probably found my knife." A.D. said that she had put the knife in her purse over the

2

weekend after using it to help with chores on her boyfriend's family's farm. She said that she intended to remove it from her purse afterward but forgot to do so. She said that she remembered that the knife was in her purse when the lockdown was announced. She confirmed that she was aware that the school has a policy that does not allow her to possess a knife at school.

Schlaak explained to A.D. that the school's policy obligated her to suspend A.D. for up to five days. Schlaak imposed a three-day suspension because A.D. was cooperative and appeared to be telling the truth. Schlaak prepared a written statement describing the incident, which A.D. signed. Schlaak informed A.D. that the school would investigate further and refer the matter to the district superintendent for a determination whether the district would commence expulsion proceedings.

On April 21, 2014, the school district served A.D. and her parents with a notice of proposed expulsion. Three days later, the school board held a hearing on the proposed expulsion. Herman, Schlaak, and superintendent Jeremy Jensen testified for the district. A.D. testified on her own behalf, along with her father, her part-time employer, the high school's athletic director, and a former pre-school teacher. Both Schlaak and A.D.'s witnesses testified that A.D. was an outstanding student who participated in sports and a mentoring program.

On the same day as the hearing, the school board issued written findings of fact, conclusions, and a recommendation that A.D. be expelled until the end of the 2013-2014 school year, a period of approximately six weeks. A.D. appealed the school board's expulsion decision to the commissioner of education pursuant to the Pupil Fair Dismissal

3

Act (PFDA). *See* Minn. Stat. § 121A.49 (2014). On July 10, 2014, the commissioner issued an order in which she affirmed the finding that expulsion is appropriate but concluded that the school board had failed to adequately explain its reasons for the duration of the expulsion. The commissioner remanded the matter to the school board with directions to provide additional justification for the duration of the expulsion. The school board reconvened on July 15, 2014, and issued a three-page letter to the commissioner in which it explained the factors it considered when deciding to expel A.D. for six weeks. On August 8, 2014, the commissioner issued a second order in which she affirmed the six-week duration of the expulsion. A.D. appeals to this court by way of a writ of certiorari.

## D E C I S I O N

### I. Mootness

In its responsive brief, the school district argues that A.D.'s appeal should be dismissed as moot. The school district contends, "The period of [A.D.]'s expulsion has passed and she has already returned to enrollment in the district." In her reply brief, A.D. argues that her appeal should not be dismissed as moot because she may suffer collateral consequences as a result of her expulsion.

"Well established in this state's jurisprudence is the precept that the court will decide only actual controversies. If the court is unable to grant effectual relief, the issue raised is deemed to be moot resulting in dismissal of the appeal." *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989). An exception to the mootness doctrine exists if "collateral consequences attach to the judgment." *In re McCaskill*, 603 N.W.2d 326, 327

4

(Minn. 1999). Under this exception, an appeal will not be dismissed as moot if the appellant can identify collateral consequences arising from the judgment, and an appellate court will presume that collateral consequences exist if "real and substantial disabilities attach to a judgment." *Id.* at 329 (quotation omitted).

A.D. contends that, without a decision from this court, she may suffer collateral consequences from the expulsion because, for example, she will be required to disclose the expulsion on applications to colleges and universities, and the expulsion may cause her to be denied acceptance. The school district contends in turn that there is no evidence in the record to support A.D's argument concerning collateral consequences and that A.D. will have been accepted to a college or university by the time this decision is released. But "if real and substantial disabilities attach to a judgment, we do not require actual evidence of collateral consequences but presume such consequences will result." *Id.* (quotation omitted). We presume that these collateral consequences exist because the possible disadvantages that A.D. could suffer if she is required to disclose her expulsion in undergraduate, postgraduate, or job applications are "real and substantial disabilities." *See id.*; *see also Goss v. Lopez*, 419 U.S. 565, 575, 95 S. Ct. 729, 736 (1975) (stating that suspension from school "could . . . interfere with later opportunities for higher education and employment"); *State v. Jones*, 516 N.W.2d 545, 546-47 n.1 (Minn. 1994) (concluding, without reference to evidence in record, that appeal of criminal defendant was not moot in part because "having a criminal record could affect his ability to obtain future employment"). "A party may rebut this presumption of collateral consequences only by showing there is no possibility" of collateral consequences. *McCaskill*, 603

N.W.2d at 329 (quotation omitted). The school district has not shown that there is no possibility that A.D. will be disadvantaged by her expulsion. Thus, A.D.'s appeal should not be dismissed as moot.

## II. Expulsion

A.D. argues that the school board erred by expelling her in violation of the PFDA and that the commissioner erred by upholding the school board's decision.

Under the PFDA, a student who has been expelled has the right to appeal the school board's expulsion decision to the commissioner of education. Minn. Stat. § 121A.49. The student then may seek judicial review of the commissioner's decision in this court by way of a writ of certiorari. Minn. Stat. § 121A.50 (2014); Minn. Stat. §§ 14.63-69 (2014). This court reviews the commissioner's decision to determine whether it is

> (a)     in violation of constitutional provisions; or
>
> (b)     in excess of the statutory authority or jurisdiction of the agency; or
>
> (c)     made upon unlawful procedure; or
>
> (d)     affected by other error of law; or
>
> (e)     unsupported by substantial evidence in view of the entire record as submitted; or
>
> (f)     arbitrary or capricious.

Minn. Stat. § 14.69. We may affirm the commissioner's decision, remand for further proceedings, reverse, or modify the decision. *Id.* "Although in form we are reviewing the commissioner's decision . . . in substance we are reviewing the school board's

6

decision directly." *In re Expulsion of N.Y.B.*, 750 N.W.2d 318, 323 (Minn. App. 2008).

We defer to the school board's factual findings so long as they are supported by substantial evidence. *See In re Denial of Eller Media Co.'s Applications for Outdoor Advert. Device Permits*, 664 N.W.2d 1, 7 (Minn. 2003); *see also In re Expulsion of I.A.L*, 674 N.W.2d 741, 746 (Minn. App. 2004) (applying substantial-evidence test to school board's findings). "Substantial evidence consists of: 1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than some evidence; 4) more than any evidence; and 5) evidence considered in its entirety." *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 833 (Minn. 2006) (quotation omitted). "[W]e generally defer to a school board's judgment on matters of student discipline" because "[j]udicial intervention in the public-school system requires restraint." *N.Y.B.*, 750 N.W.2d at 323.

The PFDA allows a school district to expel a student on any of the following grounds:

> (a) willful violation of any reasonable school board regulation. Such regulation must be clear and definite to provide notice to pupils that they must conform their conduct to its requirements;

> (b) willful conduct that significantly disrupts the rights of others to an education, or the ability of school personnel to perform their duties, or school sponsored extracurricular activities; or

> (c) willful conduct that endangers the pupil or other pupils, or surrounding persons, including school district employees, or property of the school.

7

Minn. Stat. § 121A.45, subd. 2. In this case, the school board voted to expel[1] A.D. through the end of the school year, a period of approximately six weeks, based on paragraphs (a) and (c) of the above-quoted statute.

A.D.'s arguments implicate issues of the proper interpretation of the PFDA. "The objective of all statutory interpretation is 'to give effect to the intention of the legislature in drafting the statute.'" *State v. Thompson*, 754 N.W.2d 352, 355 (Minn. 2008) (quoting *State v. Iverson*, 664 N.W.2d 346, 350 (Minn. 2003)). "The principal method of determining the legislature's intent is to rely on the plain meaning of the statute." *Id.* To identify the plain meaning of a particular word used in a statute, it is appropriate to refer first to the common usage of the word. *See Gassler v. State*, 787 N.W.2d 575, 586 n.11 (Minn. 2010). "We are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *American Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000).

## A. First Basis: Willful Violation of Regulation

A.D. first contends that the school board and the commissioner erred by concluding that her expulsion satisfies paragraph (a) of section 121A.45, subdivision 2.

The school district has adopted a policy that states, "No student . . . shall possess, use or distribute a weapon when in a school location." It is undisputed that A.D.'s knife

---

[1]Under the PFDA, expulsion is one type of dismissal. "'Dismissal' means the denial of the current educational program to any pupil, including exclusion, expulsion, and suspension" but "does not include removal from class." Minn. Stat. § 121A.41, subd. 2 (2014). "'Expulsion' means a school board action to prohibit an enrolled pupil from further attendance for up to 12 months from the date the pupil is expelled." Minn. Stat. § 141A.41, subd. 5.

is considered a weapon under the policy. According to the policy, "'Possession' means having a weapon on one's person or in an area subject to one's control in a school location." The policy also contains a safe-harbor provision, which states, "A student who finds a weapon on the way to school or in a school location, or a student who discovers that he or she accidentally has a weapon in his or her possession, and takes the weapon immediately to the principal's office shall not be considered to possess a weapon."[2]

After the evidentiary hearing, the school board concluded that A.D.'s "conduct at school on April 15, 2014, constituted a willful violation of reasonable School Board regulations." This conclusion apparently is based on findings that A.D. "admitted that the knife was hers and that the knife had been in her locker" and "stated she normally took the knife out of her purse when she went to school, but that when the lockdown was announced, she remembered that she had not taken it out of her purse." The school board also found that A.D. "stated she was worried that the knife may be found, but did not report the fact that she had the knife to her teachers or the principal." The school board's conclusion also is based on the following reasoning:

> [A.D.] knew, or should have known, that she could be
> expelled for bringing a knife to school. While she stated that
> she simply forgot that the knife was in her bag, she admitted
> that she immediately remembered that the knife was in her

---

[2]The safe-harbor provision of the policy was not fully and accurately restated in the student handbook and the student agenda book, which are the two primary means by which the school district communicates the policy to students. In each of those documents, the description of the safe-harbor provision omits the phrase, "or a student who discovers that he or she accidentally has a weapon in his or her possession." Those documents state merely, "A student who finds a weapon on the way to school or in a school building [or any school location] and takes the weapon immediately to the principal's office shall not be considered to possess a weapon."

bag when the notice was made about the locker searches, but she did not immediately report it to her teachers or the Principal.[3]

The commissioner concluded that the school board's decision was supported by the record and satisfied the statutory requirements.

A.D. contends that the school board erred because it did not find that she committed a "willful violation" of the school district court's weapons policy. The terms "willful violation" and "willful" are not defined in the PFDA. A leading legal dictionary defines "willful" to mean "[v]oluntary and intentional, but not necessarily malicious." *Black's Law Dictionary* 1737 (9th ed. 2009). In the criminal context, this court has said:

> Willful generally means a bad purpose or evil intent in statutes involving moral turpitude. *U.S. v. Illinois Central Railroad*, 303 U.S. 239, 58 S. Ct. 533, 82 L. Ed. 773 (1938); *State v. Bowers*, 178 Minn. 589, 228 N.W. 164 (1929). In misdemeanor statutes, it means a voluntary, knowing and intentional act, as distinguished from accidental, involuntary or unintentional. *U.S. v. Perplies*, 165 F.2d 874 (7th Cir. 1948). *See*, *Illinois Central Railroad*, 303 U.S. at 242-43, 58 S. Ct. at 534-35.

*State v. Green*, 351 N.W.2d 42, 44 (Minn. App. 1984); *see also State v. Cyrette*, 636 N.W.2d 343, 348 (Minn. App. 2001) (concluding that "willfully," as used in child-neglect statute, means "intentional"), *review denied* (Minn. Feb. 19, 2002).

---

[3]Schlaak asked A.D. if she had brought her purse to school on the prior day, and A.D. said that she had not done so. During the ensuing investigation, Herman reviewed surveillance video-recordings and saw that A.D. had brought the same purse to school on the day before the knife was found, and the school board found that A.D. had therefore also brought the knife to school the day before the lockdown. In any event, the school board's finding that A.D. lied is limited to that one particular statement about the day before the lockdown. The school board did not find A.D. to be not credible in general and did not find that her misstatement concerning the prior day undermined her statements concerning the day in question.

10

To reiterate, the PFDA requires not just willful conduct but a "willful violation." Minn. Stat. § 121A.45, subd. 2(a). The supreme court has explained the meaning of the term "willful violation" on only one occasion. In the context of a party's failure to respond to discovery requests, the supreme court has defined "willful violation of discovery rules" to require "a knowing awareness of the duty imposed . . . and, in spite of this awareness, a deliberate, conscious, and intentional choice to disregard this duty." *Garrity v. Kemper Motor Sales*, 280 Minn. 202, 207, 159 N.W.2d 103, 107 (1968). Accordingly, paragraph (a) of section 121A.45, subdivision 2, requires not just that a student violates a school policy but also that the student is aware of the policy and makes a "deliberate, conscious, and intentional choice" to violate the policy. *See id.*

In this case, the school board did not find that A.D. willfully violated the weapons policy by carrying a knife into the school building in her purse on April 15, 2014. The school board did not find that A.D. was aware that she was in possession of a knife when she entered the school building or at any time before the lockdown. The school board seems to have accepted as true A.D.'s testimony that she forgot about the knife when going to school on that day. The school board's order does not state that A.D.'s testimony on that point was not credible. Thus, the findings of fact in the school board's order are not sufficient to support the school board's conclusion that A.D. willfully violated the school's weapons policy by carrying the knife to school in her purse.

The school district suggests that A.D. willfully violated the school's weapons policy because her conduct does not satisfy the requirements of the safe-harbor

11

provision.[4]  The school district's suggestion fails for two reasons.  First, the record demonstrates that the terms of the safe-harbor provision were not "clear and definite," as required by the PFDA.  *See* Minn. Stat. § 121A.45, subd. 2(a).  The school district maintained multiple documents that described the safe-harbor provision, and each document did so in a different way.  The school district seeks to rely on a version that allows a student to avoid punishment by turning in his or her own weapon to school administrators.  But the two versions that the school provided directly to students do not allow a student to avoid a violation by turning in his or her own weapon; those versions would allow a student to avoid a violation if the student finds and then turns in someone else's weapon.  A.D. testified that she was unaware of any opportunity to avoid a violation by making a voluntary self-disclosure.  The school board did not make any contrary finding.  The school district cannot establish that A.D. willfully violated the safe-harbor provision of the weapons policy without evidence and a finding that A.D. was aware of the terms of the particular version of the safe-harbor provision that she was alleged to have violated.

---

[4]We question whether a student commits an independent violation of the school district's weapons policy if the student's conduct does not trigger the safe-harbor provision.  The school district's written and oral arguments are unclear and seemingly inconsistent as to whether the safe-harbor provision is an independent basis for a violation of the policy.  It appears that the safe-harbor provision is not an independent basis for a violation; rather, the safe-harbor provision simply allows a violation to be negated if a student makes a voluntary self-disclosure.  Nonetheless, for purposes of a thorough discussion of the school district's arguments, we assume without deciding that a student violates the school district's weapons policy by not making a voluntary self-disclosure.

Second, even if A.D. had been aware of the version of the safe-harbor provision that the school district has invoked, she was prevented from complying. All versions of the safe-harbor provision state that a student "shall not be considered to possess a weapon" if the student "takes the weapon immediately to the principal's office." During the lockdown, however, A.D. was prohibited from leaving her classroom. After the lockdown, she could not have complied with the safe-harbor provision because Herman had confiscated the knife, thereby removing it from her possession. The school district cannot establish that A.D. willfully violated the safe-harbor provision of the weapons policy by not verbally informing a member of the school's staff of the existence of a weapon elsewhere in a school building because the safe-harbor provision does not allow a student to avoid a violation by that type of self-disclosure.

Therefore, A.D. did not willfully violate the school district's weapons policy by bringing a knife to school or by not disclosing the existence of the knife after the lockdown began.

**B.      Second Basis: Willful Conduct Endangering Self or Others**

A.D. also contends that the school board and the commissioner erred by concluding that her expulsion satisfies paragraph (c) of section 121A.45, subdivision 2.[5]

---

[5]The commissioner did not affirm the school board on this ground, even though A.D. argued to the commissioner that the school board erred by concluding that she engaged in willful conduct that endangered herself or others. The commissioner considered only whether A.D. willfully violated a school regulation and affirmed the school board on that basis. In her appellate brief, A.D. challenges both of the school board's bases for her expulsion. She does not contend that the expulsion is not justified by the second basis on the ground that the commissioner did not affirm the school board

After the evidentiary hearing, the school board concluded that A.D.'s "conduct at school on April 15, 2014, constituted . . . willful conduct that endangered [A.D.], other pupils, and surrounding persons." This conclusion apparently is based on the undisputed fact that A.D. carried a knife into the school building inside her purse, which was stored inside her locker, as well as the finding that she "created a material and substantial risk of harm to other students and staff by possessing a knife on school property."

A.D. contends that the school board erred by concluding that she engaged in willful conduct that endangered herself or others. The term "endanger" is not defined in the PFDA. The plain meaning of the word "endanger" is "to bring into danger or peril of probable harm or loss." *Webster's Third New International Dictionary* 748 (3d ed. 1961). The school district relies on Jensen's testimony that the presence of A.D.'s knife in her locker endangered students and staff because "it could get into the wrong hands." There was no finding and no evidence that A.D. intended to remove the knife from her purse while at school or that any other student was aware of the presence of a knife inside her purse inside her locker. The mere presence of A.D.'s knife inside her purse inside her locker may give rise to the potential for danger, but it does not rise to the level of "probable harm or loss." *See id*. This interpretation of the PFDA is consistent with the supreme court's observation, in a juvenile delinquency prosecution for possession of a knife in a school, that "knives as common household utensils are clearly not inherently dangerous, as they can be used for a myriad of completely benign purposes." *In re*

on that basis. Thus, we will consider and resolve A.D.'s argument that the school board's second basis for the expulsion is erroneous.

14

*Welfare of C.R.M.*, 611 N.W.2d 802, 810 (Minn. 2000). The PFDA permits a school district to expel a student for willfully violating a reasonable policy, and the school district in this case had a policy that prohibits the possession of a weapon in the school. But the structure and language of section 121A.45, subdivision 2, indicates that paragraph (c) requires something more than conduct that creates the mere possibility of harm, which may be regulated by a policy that may be vindicated pursuant to paragraph (a). Thus, the evidence in the record of the school board's evidentiary hearing does not support the school board's conclusion that A.D. engaged in willful conduct that endangered herself or others.

In sum, we reverse the decisions of the school board and the commissioner. *See* Minn. Stat. § 14.69; *In re Wang*, 441 N.W.2d 488, 492-94 (Minn. 1989) (reversing and granting relief to relator because agency decision was affected by error of law and lacked substantial evidence); *Beaty v. Minnesota Bd. of Teaching*, 354 N.W.2d 466, 471 (Minn. App. 1984) (reversing and granting relief to relator because agency decision was affected by error of law).

**Reversed.**