In the Matter of UNIVERSITY OF MINNESOTA and Foster Wheeler Twin Cities, Inc.

In re APPLICATION FOR an AIR EMISSION FACILITY PERMIT FOR THE UNIVERSITY'S STEAM SERVICE FACILITIES.

Nos. C4–96–2526, C9–96–2411.

Court of Appeals of Minnesota.

July 8, 1997.

Charles N. Ek, Law Office of Charles N. Ek, P.A., Minneapolis, for Relators Save Our Riverfront Coalition, Friends of the Mississippi River, Inc., and Phyllis Kahn.

Susan Hedman, Environmental Law & Policy Center, Chicago, IL and Michael D. Madigan, Johnson & Madigan, P.L.L.P., Minneapolis, for Relators Minnesotans for an Energy Efficient Economy and Senator Ellen Anderson.

Hubert H. Humphrey, III, Attorney General, Stephen A. Shakman, Lisa R. Tiegel, Assistant Attorneys General, St. Paul, for Respondent Minnesota Pollution Control Agency.

John B. Gordon, Rebecca L. Rom, Faegre & Benson, L.L.P., Minneapolis, for Permittee–Respondent Foster Wheeler Twin Cities, Inc.

James A. Payne, Bruce A. Peterson, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for Permittee–Respondent University of Minnesota.

Leslie Davis, Minneapolis, amicus curiae–pro se.

Considered and decided by HARTEN, P.J., and NORTON and SCHULTZ, *JJ.

## OPINION

HARTEN, Judge.

The Minnesota Pollution Control Agency (the MPCA) issued an air emissions permit to respondents University of Minnesota and Foster Wheeler Twin Cities, Inc. authorizing renovation of the University's steam generation system. Relators contend that the MPCA decision to issue the permit is unsupported by substantial evidence, arbitrary and capricious, and based on an erroneous interpretation of the law. We affirm.

## FACTS

The University of Minnesota (the University) and Foster Wheeler Twin Cities, Inc. (FTC) respectively own and operate three steam generating plants that provide for heating, air conditioning, and other University campus needs. Two of the steam plants, the Main Steam Service Facility (Main Plant), and the Southeast Service Facility (Southeast Plant), are located on the riverbank of the Mississippi River in Minneapolis, and the third plant, the St. Paul Steam Service Facility, is located adjacent to the state fairgrounds in St. Paul.

In 1988, responding to a growing concern about the continued use of its steam plant facilities, the University hired a consultant to evaluate its steam systems and long-term energy requirements. In 1989, after being advised that the University steam plants had a remaining useful life of about 10 years, the University regents began a three-year study. The University solicited proposals from more than 100 qualified vendors worldwide, reviewed detailed proposals submitted by eight vendors, and conducted intensive negotiations with three vendors. In April 1992, the Board of Regents entered into a design and construction contract with FTC.

In June 1992, the University submitted a steam plant renovation proposal to the Minnesota Environmental Quality Board (MEQB) for critical environmental review. The ensuing three-year review involved at least four public hearings and culminated in a detailed Environmental Impact Statement (EIS), which analyzed the environmental impact of the proposed steam plant project and numerous project alternatives.

In August 1994, the University submitted the original permit application to the MPCA. Federal Clean Air Act regulations require preconstruction permits for construction and

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

modification of certain new emission sources. 40 C.F.R. § 52.21(i) (1996). Minn. R. 7007.3000 (1995) has delegated implementation and enforcement of the federal rules to the MPCA. Installation of new boilers and other changes proposed in the 1994 permit application are evaluated under these rules.[1]

The University's proposal provides that the coal-burning Main Plant will be shut down. The Southeast Plant, in operation since 1903, will be rehabilitated; its two existing coal boilers will be replaced with two new gas/oil boilers and a state-of-the-art circulating fluidized bed boiler (CFB) capable of burning a variety of fuels, including coal, gas, oil, and renewable fuels such as wood. In addition, a steam turbine will be installed in the Southeast Plant to provide 15 megawatts of electricity. Two coal boilers will be retired and a new gas/oil boiler will be installed at the St. Paul Plant.

In December 1995 and January 1996, the University regents issued a report to the University administration stating that "all project options represent environmental improvements, [but] each option has some shortcomings and presents different trade-offs of different environmental interests and community values."

During the 1996 legislative session, the MEQB issued its report to the legislature summarizing the EIS findings, as required by Minn.Stat. § 116G.15 (1996). The report included: (1) several alternative project proposals with the environmental advantages and disadvantages of each; (2) an indication that the EIS did not identify an environmentally superior alternative to the University's proposal; (3) an indication that the proposed renovation is superior to the existing facilities; and (4) a warning that further delay in implementing the renovation would itself be a "significant environmental impact."

After the EIS was completed, the MPCA informed the University that it proposed to resume working on the project permit. In order to begin processing the permit, the MPCA required that the University submit a supplemental permit application and commit to the following conditions:

1. The facilities would be required to burn a minimum of 70% natural gas on an annual basis for the life of the permit.
2. The facilities would be allowed a fuel-flexibility option, but petroleum coke would not be a fuel option.
3. The air emissions permit would not be issued until after the legislature adjourned in 1996.

In April 1996, the University and FTC supplemented the permit application. The application was amended to accommodate several recommended measures intended to improve riverfront esthetics, minimize emissions of fugitive coal dust, and eliminate coal traffic between the coal storage facility and the Southeast Plant. These measures involved enclosing and screening the coal storage facilities at the Main Plant, eliminating coal truck traffic near the river by installing an underground conveyor system for the Southeast Plant, and doubling (from 50% to 100%) the natural gas capability of the new CFB boiler.

On June 15, 1996, the MPCA issued a public notice of its commissioner's preliminary decision to issue the permit and established a comment period of June 15 to July 15, 1996. MPCA staff prepared the draft permit. The commissioner gave public notice of the draft permit and made both it and an associated technical support document available for public review.

On August 27, 1996, the MPCA Board heard and considered a number of public comments. At that meeting, representatives of the City of Minneapolis Planning Department and NorAm Energy Management, Inc. claimed that the project would violate the Shoreland Development Act, Minn.Stat. § 103F.201–.221 (1996), related state rules, and a City of Minneapolis ordinance governing shorelands. The MPCA Board extended until September 6, 1996, the period to accept

---

1. The Environmental Protection Agency (EPA) issued a letter opinion on May 13, 1993, stating that the three steam plants constitute a single "stationary source" under 40 C.F.R. § 52.21(b)(5) (1996). Thus, the MPCA requested that the University and FTC apply for one air permit covering all three steam plants.

additional comments related to the shoreland issues. During this extension period, the University and relators submitted comments regarding the shoreland issue and NorAm Energy Management cautioned that the project also would violate the Floodplain Management Law, Minn.Stat. §§ 103F.101–.155 (1996).

The commissioner directed MPCA staff to seek input regarding the shoreland and floodplain issues from the Minnesota Department of Natural Resources (MDNR), which administers both the shoreland and floodplain laws. The MDNR advised the MPCA that the proposed project would not violate statutes or rules governing shorelands or floodplains.

On October 22, 1996, the MPCA Board met and again considered the proposed permit. After considering all oral and written comments, it voted to issue the air emission permit. In its primary and supplemental findings of fact and conclusions of law, the Board stated its rationale for issuing the permit and rejecting each of the challenges.

Relators Save Our Riverfront Coalition, Friends of the Mississippi River, and Phyllis Kahn (collectively, SORC) obtained a writ of certiorari to review the MPCA decision. Relators Minnesotans for an Energy Efficient Economy and Ellen Anderson (collectively, ME3) separately obtained a similar writ of certiorari. This court consolidated the appeals on motion of respondent University.

## ISSUES

1. Was the MPCA decision to grant an air emissions permit based on errors of law?

2. Were the MPCA factfindings based on substantial evidence?

3. Does the MPCA determination conflict with shoreland or floodplain regulations?

## ANALYSIS

### 1. Standard of Review

 Our review of the MPCA decision is governed by the Administrative Procedure Act, Minn.Stat. §§ 14.63–.69 (1996). *See In re American Freight Sys., Inc.,* 380 N.W.2d 192, 195 (Minn.App.1986) (reviewing decision by Minnesota Transportation Regulation Board).

Agency decisions are presumed to be correct by reviewing courts, and will be reversed only when they reflect an error of law or when the findings are arbitrary and capricious or unsupported by substantial evidence.

*In re Hutchinson,* 440 N.W.2d 171, 176 (Minn.App.1989), *review denied* (Minn. Aug. 9, 1989). This court generally defers to an agency's expertise. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). The relators have the burden of proof on appeal when challenging an agency decision under Minn.Stat. § 14.69. *Markwardt v. State Water Resources Bd.,* 254 N.W.2d 371, 374 (Minn.1977); *MT Properties, Inc. v. Alexander,* 433 N.W.2d 886, 893 (Minn.App. 1988), *review denied* (Minn. Feb. 22, 1989). An agency's decision may be reversed if it is determined to be unsupported by substantial evidence, arbitrary or capricious, or affected by other error of law. Minn.Stat. § 14.69.

### 2. MPCA Determinations of Law

 Relators contend that the MPCA decision should be reversed because it is based on errors of law. They argue that this court should conduct a de novo review of the agency's statutory interpretation. Although we are not bound by the agency's interpretation of the law,

an agency's interpretation of the statutes it administers is entitled to deference and should be upheld, absent a finding that it is in conflict with the express purpose of the Act and the intention of the legislature.

*Geo. A. Hormel & Co. v. Asper,* 428 N.W.2d 47, 50 (Minn.1988). We have held that when an agency reasonably interprets a statute, it is the role of the legislature or the supreme court, and not the role of this court, to overrule that interpretation. *In re Hyman Freightways, Inc.,* 488 N.W.2d 503, 505 (Minn.App.1992). Moreover, deference to the MPCA interpretation of the Minnesota Environmental Policy Act (MEPA) (codified at Minn.Stat. §§ 116D.01–.11 (1996)) is appropriate in light of recognition that MEPA

and Minnesota Environmental Rights Act (MERA) (codified at Minn.Stat. §§ 116B.01–.13 (1996)) are

> couched in general terms, leaving to the agencies the duty of determining precisely what standards will fulfill the environmental policy enunciated by the legislature.

*In re Independent Spent Fuel Storage Installation,* 501 N.W.2d 638, 649 (Minn.App. 1993), *review denied* (Minn. July 15, 1993) [hereinafter *Spent Fuel Storage* ].

## A. *MPCA Interpretation of Pollution Standard.*

Relators argue that the MPCA erred in issuing the permit because the renovated Southeast Plant will violate MEPA section 116D.04, subdivision 6, and MERA section 116B.09, subdivision 2. MEPA provides that:

> No state action significantly affecting the quality of the environment shall be allowed, *nor shall any permit* for natural resources management and development *be granted, where such action or permit has caused or is likely to cause pollution, impairment, or destruction of the air, water, land or other natural resources located within the state,* so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

Minn.Stat. § 116D.04, subd. 6 (emphasis added). MERA contains similar language. *See* Minn.Stat. § 116B.09, subd. 2. MEPA incorporates by reference the definition of "pollution, impairment or destruction" contained in MERA. Minn.Stat. § 116D.04, subd. 1a(b). MERA section 116B.02, subdivision 5, defines "pollution, impairment or destruction" as

> any conduct by any person which violates, or is likely to violate, any environmental quality standard, limitation, rule, order, license, stipulation agreement, or permit of the state or any instrumentality, agency, or political subdivision thereof which was issued prior to the date the alleged viola-

tion occurred or is likely to occur or *any conduct which materially adversely affects or is likely to materially adversely affect the environment* * * *.

(Emphasis added.)

The MPCA determined that the renovation is not likely to have a material adverse effect on the environment. Relators argue that this determination was based on an erroneous interpretation of the above statutory definition. Relators assert that because the MPCA focused on the site of the Southeast Plant as it currently exists, two legal errors resulted. First, they argue that the MPCA failed to evaluate the projected total emissions of the proposed facility, but instead examined the emissions from the proposed facility *in comparison with* those currently emitted from the existing facility. Second, relators argue that the MPCA also erred by limiting the scope of its inquiry to the effect of emissions on the site environment rather than statewide.

■ The MPCA's supplementary findings of fact state:

> When the MPCA analyzes whether a facility's proposed operation will cause pollution, impairment or destruction within the meaning of Minn.Stat. § 116D.04, subd. 6 (1994), it considers *the total emissions.*

These findings imply that the MPCA in fact did examine record evidence regarding the total emissions from the proposed project, not only emissions based on a comparison of current emissions with projected emissions. Relators do not point to any specific evidence in the record indicating that current emissions from the steam plant's operations have had a *material adverse effect* on the environment, nor do they point to any evidence showing that the MPCA did not actually examine the "total emissions" from the proposed facility as the agency findings set forth.

■ Moreover, the MPCA's examination of the proposed permit in light of the existing site is a reasonable interpretation of the statute. MERA, which sets forth the definition of "pollution, impairment, and destruction" adopted by MEPA, is modeled after the

Michigan Environmental Protection Act. We are guided generally by the construction placed on the Michigan act. *State ex rel. Wacouta Township v. Brunkow Hardwood Corp.,* 510 N.W.2d 27, 30 (Minn.App.1993). Michigan courts have held that

> to determine if a prima facie showing of pollution, impairment, or destruction of a natural resource has been made * * * the trial court should evaluate the environmental situation before the proposed action and compare it with the probable condition of the environment after.

*Rush v. Sterner,* 143 Mich.App. 672, 373 N.W.2d 183, 186 (1985); *see also Kent County Rd. Comm'n v. Hunting,* 170 Mich.App. 222, 428 N.W.2d 353, 358 (1988), *review denied* (Mich. June 21, 1989). Thus, we conclude that MPCA did not err in its projected emission evaluation by comparing the current environmental condition with the probable environmental condition as projected.

Relators' second claim is that the MPCA erred by limiting the scope of its inquiry to the site environment rather than statewide. Once again, the MPCA supplemental findings indicate that it considered total emissions. An evaluation of total emissions would relate to both local and statewide impact. Moreover, we note that relators did not offer evidence of any specific statewide adverse environmental effects of the projected emissions.

### B. *MPCA Application of State and Federal Emission Standards.*

■ Relators contend that the MPCA erroneously applied Minn.Stat. § 116B.02, subd. 5, by concluding that there is no adverse impact solely because the projected emissions comply with state and federal regulations. Relators argue that despite the facility's compliance with state and federal emission standards, the MPCA was obliged to consider apart from those standards whether emissions from the permitted facility would have a material adverse effect on the environment. We disagree. We have previously held that there is no basis for a finding of pollution where a permit application complies with all state and federal standards. *See In re Combined Air & Solid*

*Waste Permit No. 2211–91–OT–1,* 489 N.W.2d 811, 814–15 (Minn.App.1992) (reversing MPCA permit denial based on finding that dioxin emissions from the proposed facility would have a material adverse effect on the environment notwithstanding compliance with dioxin emission standards), *review denied* (Minn. Oct. 28, 1992) [hereinafter *Combined Air* ]; *see also In re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility,* 421 N.W.2d 398, 405 (Minn.App. 1988) (no basis for a finding of pollution where the agency found emissions were within applicable federal and state standards), *review denied* (Minn. May 18, 1988) [hereinafter *Red Wing* ]. Accordingly, we conclude that because the proposed facility complies with applicable state and federal emission standards, the MPCA conclusion that it would not adversely affect the environment does not result from an erroneous application of law.

### C. *MPCA Consideration of Land Use.*

SORC contends that the MPCA erred by failing to examine the effects of the renovated Southeast Plant on the long-term riverfront planning goals of the City of Minneapolis. We disagree. The record indicates that the MPCA examined this issue and concluded that the renovation would not alter the "footprint" of the existing plant. The MPCA found that the contemplated minimal structural changes to the Southeast Plant would not have a material adverse effect on scenic or aesthetic resources and consequently would not result in "pollution, impairment or destruction."

■ Pursuant to MEPA, the MPCA has a duty to consider land use factors only to the extent relevant to determining whether the proposed project will result in adverse effects on the *present* environment. The agency declined to consider whether continued use of the Southeast Plant eventually might conflict with possible future riverfront development. We conclude that the MPCA is not required to speculate as to future environmental effect were the city's development of the area actually accomplished. *See Kent County Rd. Comm'n,* 428 N.W.2d at 358 (to determine pollution, impairment or

destruction, relevant inquiry is to compare present environmental situation with the condition of the environment after the action); *Rush,* 373 N.W.2d at 186 (same holding).

### D. *MPCA Consideration of Mercury Emission.*

Relators claim that the MPCA erred as a matter of law by failing to require a permit provision limiting mercury emission. Relators cite *Minnesota Pub. Interest Research Group v. White Bear Rod & Gun Club,* 257 N.W.2d 762 (Minn.1977), in support of their argument that the MPCA should have imposed a limitation on mercury emission despite the absence of state or federal standards governing mercury emission. In *White Bear Rod,* the supreme court affirmed a district court's finding that MERA barred operation of a skeet-shooting facility that negatively impacted the environment even though no specific standard was violated. *Id.* at 768–71, 783. Although that decision supports the proposition that the agency *may* impose a limitation in the absence of a state or federal standard, it does not establish a duty to impose such limitations.

▉ Moreover, the record demonstrates that the MPCA did consider the effects of mercury emission. The evidence showed that ascertainment of a level that constitutes an " 'acceptable' level of mercury emissions from a new University steam plant is largely a non-quantifiable policy issue," and that emission reduction could best be accomplished through fuel selection, as the project contemplates. MPCA determined that "[t]here may be little or no benefit to public health to require control or reduction of HAPs [hazardous air pollutants, including mercury] from boilers of the size of the University's" and that mercury emission is "unlikely to be a problem that can be solved one permit at a time." We hold that the agency, applying its expertise, considered mercury emission and reached a reasonable conclusion. *See Reserve Mining,* 256 N.W.2d at 824 (court should not interfere with agency determination based on value judgments and expertise).

### 3. MPCA Factfindings

#### A. *Deference to Agency—Existing Contract.*

This court generally defers to an agency's factfinding expertise. *Combined Air,* 489 N.W.2d at 814. ME3 argues that deference here is inappropriate because by executing a contract with FTC before environmental reviews were initiated, the University effectively precluded the MPCA from undertaking reasoned decision-making on MEPA issues. *See Reserve Mining,* 256 N.W.2d at 825 (judiciary should not defer to factual findings where a combination of danger signals indicate that the agency "has not genuinely engaged in reasoned decision-making"). ME3 argues that the University's contract with FTC, executed prior to the completion of the EIS, violated Minn. R. 4410.3100, subp. 2 (1995), which precludes governmental units from taking "any action * * * [that] *will prejudice the ultimate decision on the project,* until * * * the final EIS has been determined adequate * * *." (Emphasis added.) An action prejudices the ultimate decision on a project if it tends to determine subsequent development or to limit alternatives or mitigative measures. Minn. R. 4410.3100, subp. 2. Thus, ME3 asserts that we should not defer to the agency factfindings because the University sought a permit for a project already under contract and the MPCA therefore turned a "blind eye" to any prejudicial impact of the contract.

We need not address this issue because the contract between the University and FTC is not part of the agency record. *See Thiele v. Stich,* 425 N.W.2d 580, 582–83 (Minn.1988) (appellate court may not base its decision on matters outside of the record). But even were it part of the record, relators have done no more than make an allegation; they have not presented any evidence establishing that the agency's review was compromised. And regardless of the contract between the University and FTC, the MPCA was free to deny the permit application if the proposal did not comply with statutory criteria.

#### B. *MPCA Finding of No Material Adverse Effect.*

▉ To establish that the MPCA decision is unsupported by substantial evidence,

relators must demonstrate that the decision lacks foundation such that a reasonable mind, considering the record in its entirety, might accept as adequate to support the agency action. *See Reserve Mining,* 256 N.W.2d at 825 (adopting substantial evidence test). In reviewing the agency findings, we examine the record to determine whether the evidence before the agency reasonably supports its factfindings. *Rock Island Motor Transit Co. v. Murphy Motor Freight Lines, Inc.,* 239 Minn. 284, 289, 58 N.W.2d 723, 727 (1953). An agency finding is supported by substantial evidence if the evidence considered in its entirety, is (1) more than a scintilla of evidence; (2) more than "some evidence" and more than "any evidence;" and (3) such that a reasonable mind might accept as adequate to support a conclusion. *Reserve Mining,* 256 N.W.2d at 825. The burden is on the relator to demonstrate that the agency's findings are unsupported by the evidence. *Id.*

 Relators argue that the EIS contains ample evidence to show that the proposed plant will emit significant quantities of sulfur dioxide, particulate matter, nitrogen oxides, carbon dioxide, and mercury. Relators therefore assert that the MPCA erred by not finding a material adverse effect on the environment from carbon dioxide and mercury emissions. Relators, however, fail to point to evidence identifying the specific adverse effect those emissions will have on the environment. Because we have no means of reviewing relators' generalized concern about carbon dioxide and mercury emissions, it is inadequate to support a reversal of agency action. *See Combined Air,* 489 N.W.2d at 814 (generalized concern about possible environmental effect of pollutant insufficient to support denial of permit).

 Relators also contend that the evidence in the EIS concerning emissions, coupled with MPCA's past position in an unrelated contested case before the Public Utilities Commission (PUC) concerning the quantification of environmental costs under Minn.Stat. § 216B.2422, subd. 3(a) (1996), compels us to conclude that the MPCA's decision here was unsupported by substantial evidence or arbitrary and capricious.

We disagree. An agency decision is arbitrary and capricious when it represents the agency's will and not its judgment. *Markwardt,* 254 N.W.2d at 374. In the unrelated PUC proceeding, the MPCA submitted a brief stating that there are "no thresholds for criteria pollutants below which damages do not occur." Relators argue that given the emissions notation in the EIS, the agency's determination of no adverse effect on the environment is inconsistent with its position in the PUC proceeding; therefore, the MPCA issuance of a permit here is arbitrary and capricious and requires reversal.

Relators and MPCA agree that the steam plants will produce certain emissions. The parties' disagreement is whether these emissions will "materially adversely affect" the environment. The supreme court has explained that a "material" effect is synonymous with a "substantial" effect. *White Bear Rod & Gun Club,* 257 N.W.2d at 782 n. 11. We have noted that almost every human activity has some kind of adverse effect on the environment. *Wacouta,* 510 N.W.2d at 30. MERA is not to be construed, however, to prohibit all human enterprise. *Id.* This court has previously applied a four-factor test to determine whether damage to a natural resource is likely to cause a material adverse affect on the environment. *See id.* at 30–31 (applying four factor test to determine whether effect on natural resource is likely to cause material adverse effect on environment). Recently, the Minnesota Supreme Court adopted a modified version of the *Wacouta* factors as a guide to determine whether certain conduct has a material adverse effect on or is likely to have a material adverse effect on the environment under Minn.Stat. § 116B.02, subd. 5:

(1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;

(2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;

(3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected re-

sources are easily replaceable (for example, by replanting trees or restocking fish); (4) Whether the proposed action will have significant consequential effects on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed); (5) Whether the affected natural resources are significantly increasing or decreasing in number, considering the direct and consequential impact of the proposed action. *State by Schaller v. County of Blue Earth,* 563 N.W.2d 260, 267 (Minn.1997). But relators do not address these criteria. They speculate that unlawful emissions will occur and per se adversely affect the environment.

■ We have reviewed the record and conclude that the agency findings and comments indicate or reasonably imply that MPCA, utilizing its expertise, examined the emissions data and corresponding environmental impact and reached a reasonable conclusion. Once again, relators fail to point out evidence illustrating any specific material adverse environmental effect from the emissions. Without such evidence, relators' concerns are but general concerns that effectively elude review. We therefore decline to interfere with the agency's decision on this issue. *See Reserve Mining,* 256 N.W.2d at 824 (court should not interfere with agency determination based on value judgments and expertise); *Markwardt,* 254 N.W.2d at 371 (relator has burden of demonstrating that agency's decision is incorrect); *Spent Fuel Storage,* 501 N.W.2d at 649 (duty of agency to determine what standards fulfill environmental policy enunciated by legislature); *Combined Air,* 489 N.W.2d at 814 (generalized environmental concern is insufficient to justify denial of a permit).

## 4. MPCA Consideration of Shoreland and Floodplain Issues

■ SORC contends that the projected renovation of the Southeast Plant will violate the Shoreland Development Act, Minn.Stat. §§ 103.201–.221 (1996), the Floodplain Management Law, Minn.Stat. §§ 103F.101–.155 (1996), related state rules, and city ordinances, thereby constituting "pollution, impairment or destruction" of the state's natural resources. The MPCA consulted with the MDNR, which has both jurisdiction and expertise in the area of shoreland and floodplain regulations, to determine whether the proposed permit would comply with shoreland development and floodplain requirements. The MDNR deputy commissioner reported that the project would violate neither the shoreland nor floodplain regulations. Although we are not bound by the MDNR's legal interpretation, it should be upheld "absent a finding that it is in conflict with the express purpose of the Act and the intention of the legislature." *Asper,* 428 N.W.2d at 50.

### A. Shoreland Regulations.

■ The implementing regulations for the shorelands development act require that municipalities adopt an appropriate ordinance "within two years of being notified by the Commissioner." Minn. R. 6120.2800, subp. 2 (1995). According to the MDNR, these shoreland controls have not been implemented in the vicinity of the Southeast Plant and therefore could not be violated by the project. SORC does not present any evidence to the contrary. We therefore conclude that the MDNR's opinion regarding application of the shoreland regulations is reasonable and the MPCA did not err in relying on it.

### B. Floodplain Regulations.

■ SORC also argues that the project violates the state floodplain regulations. The MDNR analyzed relevant details of the project and responded as follows:

> [A] question still exists as to whether the University would be subject to state floodplain rules (Minn. Rule Parts 6120.5000–6120.6200). If so, the Southeast Plant would be an existing nonconforming use. Part 6120.5800, subp. 5. The state rule, intended to permit some local flexibility, does not specify a monetary limit on alterations within the floodway, but instead encourages local governments to address the issue. *Modification of structures is permitted if the standards in Minn. Rule Part 6120.5900 are met.* The University has represented to the DNR that it will incorporate appropriate floodproofing into

its reconstruction project and that it will submit such plans to DNR for review. Since the foundation, or footprint, of the building will not be changed, *there will be no increased obstruction of flood flows or unreasonable hazards created by the alteration*. The state floodplain rules, therefore, do not provide a basis for prohibiting the Southeast Plant renovation project, as it has been represented to the DNR.

(Emphasis added.) Nevertheless, SORC challenges the MDNR's conclusion that the project does not violate the floodplain management law, claiming that the MDNR misinterprets section 103F.121, subdivision 5(a) which provides:

If a floodplain has been delineated by a floodplain management ordinance \* \* \* a major alteration to a structure in existence on the effective date of the ordinance or a new fill, structure, deposit, or other floodplain use that *is unreasonably hazardous to the public or that unduly restricts the capacity of the floodplain to carry and discharge a regional flood may not be permitted* after the effective date of the ordinance delineating the floodplain.

(Emphasis added.) SORC contends that this statute should be read to prohibit all major alterations to existing structures because the statutory intent is "to move structures out of floodplains rather than allow continued investment in them." SORC offers no legislative history or caselaw to support its statutory interpretation. Implicit in the MDNR position is its statutory interpretation, to-wit,

the statute does not prohibit all major alterations to existing structures, but only those that are "unreasonably hazardous to the public" or "unduly restrict[ ] the capacity of the floodplain." This interpretation appears reasonable in light of rules promulgated under the floodplain management law. *See* Minn. R. 6120.5800, subd. 5 (1995) (modifications of a nonconforming use are permitted so long as flood damage potential or obstruction to floodflow are not increased); Minn. R. 6120.5900, subp. 3 (1995) (alterations or additions to existing buildings may be permitted where they include adequate protective measures and do not increase flood damage potential or obstruction of flood flow); *cf. County of Ramsey v. Stevens*, 283 N.W.2d 918, 925 n. 1 (Minn.1979) ("intent of the [floodplain] statute is to restrict new development"). We conclude that the MPCA reasonably relied on the MDNR interpretation of the floodplain law.

## DECISION

The MPCA did not err in issuing an air emissions permit authorizing the University steam plant renovation project.

Affirmed.