In the Matter of the CITIES OF AN-
NANDALE AND MAPLE LAKE
NPDES/SDS PERMIT ISSUANCE
FOR the DISCHARGE OF TREATED
WASTEWATER, and Request for
Contested Case Hearing.

No. A04–2033.

Court of Appeals of Minnesota.

Aug. 9, 2005.

Janette K. Brimmer, Minnesota Center for Environmental Advocacy, St. Paul, MN, for relator Minnesota Center for Environmental Advocacy.

Mike Hatch, Attorney General, Stephanie Morgan, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Pollution Control Agency.

Edward J. Laubach, Jr., Christopher W. Harmoning, Heather I. Olson; Gray, Plant, Mooty, Mooty & Bennett, P.A., St. Cloud, MN, for respondents Cities of Annandale and Maple Lake.

Considered and decided by
PETERSON, Presiding Judge;
SCHUMACHER, Judge; and WRIGHT,
Judge.

## OPINION

WRIGHT, Judge.

Respondents City of Annandale and City of Maple Lake applied for a permit for a new wastewater-treatment plant, the discharge from which would flow into waters with impaired status under the Clean Water Act. The Minnesota Pollution Control Agency granted the permit. Relator Minnesota Center for Environmental Advocacy challenges the permit, asserting that the new source of discharge would contribute to the impairment of waters

with impaired status, in violation of federal regulations. We reverse.

## FACTS

For its wastewater treatment, the City of Annandale currently utilizes a pond system with spray irrigation that does not discharge phosphorus directly into a body of water. The City of Maple Lake currently utilizes a mechanical plant for its wastewater treatment. This wastewater plant discharges into Mud Lake, which later flows into the North Fork of the Crow River (the North Fork). Approximately 1,400 pounds of phosphorus are discharged from this plant each year.

Respondents City of Annandale and City of Maple Lake (the Cities) jointly submitted plans for a new wastewater-treatment plant in late 2002. The proposed plant will discharge 3,600 pounds of phosphorus into the North Fork each year, 2,200 pounds greater than the phosphorous discharged by the Cities' existing wastewater-treatment facilities. The North Fork flows into the Mississippi River and contributes to the Lake Pepin watershed.

Section 303(d) of the federal Clean Water Act provides that, when a designated body of water does not meet water quality standards due to an excessive level of a pollutant or lax controls over thermal discharges, a state environmental agency shall identify it as an impaired water and establish a priority ranking for the body of water. 33 U.S.C. § 1313(d)(1)(A), (B) (2000). Once a body of water is identified and ranked under Section 303(d), the state environmental agency shall establish a "total maximum daily load," (TMDL), setting the maximum amount of the pollutant permitted in that water. *Id.*, (C) (2000). One section of the North Fork, 17.9 miles downstream from the discharge point of the Cities' proposed plant, is identified as impaired under Section 303(d) because of insufficient dissolved-oxygen levels. Lake Pepin also is listed as impaired under Section 303(d) because of excessive nutrient levels. The Minnesota Pollution Control Agency (PCA) has not completed TMDLs for these waters. The PCA estimates that TMDLs will not be set before 2012 for the North Fork and 2009 for Lake Pepin.

Pursuant to the plans for the plant, on July 25, 2003, the Cities submitted an application for a National Pollutant Discharge Elimination System (NPDES) permit to the PCA for the proposed wastewater-treatment plant. The PCA gave due notice of the application and, with its request for public comment, submitted a proposed draft of the NPDES permit. The draft NPDES permit placed several limits on the plant's discharge, including a maximum level for phosphorus and a minimum level for dissolved oxygen.

Relator Minnesota Center for Environmental Advocacy (MCEA) submitted comments on July 21 and August 18, 2004. The MCEA claimed that additional phosphorus from the plant would contribute to the low dissolved-oxygen levels on the North Fork and excessive nutrients in Lake Pepin. Asserting that federal regulations do not allow a new source to cause or contribute to the impairment of Section 303(d) waters, the MCEA argued against issuance of the NPDES permit.

Following a public hearing, the PCA addressed the comments of the MCEA and recommended approval of the NPDES permit in its order dated September 28, 2004. The PCA interpreted the federal regulations to provide that, if a new source contributes to the impairment of Section 303(d) waters, but the aggregate impairment of those waters is reduced by improvements elsewhere, a NPDES permit may be issued for the new source. The PCA concluded that the 2,200–pound in-

crease in the phosphorus discharge from the Cities' proposed plant would be offset by a new wastewater-treatment plant in Litchfield that will reduce the phosphorus discharge into the North Fork by approximately 53,500 pounds per year.

Regarding the impact of the phosphorus discharge on dissolved oxygen in the North Fork, the PCA observed that the impaired section of the North Fork is 17.9 miles downstream from the discharge point for the Cities' proposed plant. Relying on an internal study, the PCA found that dissolved oxygen is most severely affected 1.8 miles downstream from the discharge point. The PCA then concluded that the discharge would not contribute to the impairment of the North Fork.

On September 30, 2004, the PCA then adopted the proposed draft and issued the NPDES permit. This appeal followed.

## ISSUE

Does a discharge of phosphorus from a new source contribute to the impairment of Section 303(d) waters, in violation of 40 C.F.R. § 122.4(i) (2004), when that discharge contains an increase in phosphorus that is offset by reductions from other sources?

## ANALYSIS

Appellate review of an agency decision ordinarily is governed by the Minnesota Administrative Procedure Act, which provides in relevant part:

> In a judicial review ... the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are: ... (d) [a]ffected by other error of law[.]

Minn.Stat. § 14.69 (2004); *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 463–64 (Minn.2002). The decision of an agency is presumed to be correct, and we ordinarily accord deference to an agency in its field of expertise. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977).

▮ The MCEA challenges the PCA's interpretation of 40 C.F.R. § 122.4(i) (2004) and argues that, under this regulation, the Cities are not entitled to receive a permit. The MCEA asserts that, when a new source will contribute to the impairment of Section 303(d) waters, the discharge cannot be offset by reductions from other sources. Because the interpretation of a federal regulation is a question of law, we need not defer to a state agency's interpretation, and we thus review de novo.[1] *MCIMetro Access Transmission*

---

1. The dissent argues that a state agency is entitled to reasonable deference in its interpretation of a federal regulation. None of the authorities cited in favor of this proposition, however, considers the interpretation of a federal regulation by a state agency. *See Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 840, 842–44, 104 S.Ct. 2778, 2780–82, 81 L.Ed.2d 694 (1984) (federal agency interpretation of federal statute); *George A. Hormel & Co. v. Asper*, 428 N.W.2d 47, 50 (Minn.1988) (state agency interpretation of a state statute); *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824–25 (Minn.1977) (same). The Fourth Circuit has held that a

state agency is not entitled to deference in its interpretation of a federal regulation. *MCIMetro Access Transmission Servs., Inc.*, 352 F.3d at 876. And the Minnesota Supreme Court has recently treated the interpretation of a federal regulation as a question of law. *Denelsbeck*, 666 N.W.2d at 346.

The dissent also implies that the same standard of review should control a state agency's interpretation of state statutes and federal regulations. But the preponderance of recent authority provides that a state agency's interpretation of a state statute is reviewed de novo. *See, e.g., In re Denial of Eller Media*

*Servs., Inc. v. Bellsouth Telecomms., Inc.,* 352 F.3d 872, 876 (4th Cir.2003); *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346 (Minn.2003); *see also In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Device Permits,* 664 N.W.2d 1, 7 (Minn.2003) (stating that courts retain authority to review de novo errors of law arising when agency decision is based on statutory construction). *See generally* 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.11 (4th ed.2002) (observing that, when separate agencies promulgate and enforce regulations, deference to the enforcing agency improperly allows inconsistent interpretation of regulations).

■ When a federal regulation is unambiguous, it shall be given effect according to its plain language without considering the intent of the agency or other extrinsic evidence. *Tozzi v. U.S. Dep't of Health & Human Servs.,* 271 F.3d 301, 311 (D.C.Cir.2001). When the meaning is in doubt, the primary consideration is the intent of the promulgating agency, which controls unless such intent is plainly inconsistent with the language of the regulation. *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997). In the absence of controlling interpretation by an agency, the meaning of a regulation is determined in accordance with canons of statutory construction. *Burns v. Barnhart,* 312 F.3d 113, 125 (3d Cir.2002); *White Bear Lake Care Ctr., Inc. v. Minn. Dep't of Pub. Welfare,* 319 N.W.2d 7, 8 (Minn.1982).

*Co's. Applications for Outdoor Adver. Device Permits,* 664 N.W.2d at 7; *Metro. Sports Facilities Comm'n v. County of Hennepin,* 561 N.W.2d 513, 515 (Minn.1997); *In re Petition to Adopt S.T.,* 512 N.W.2d 894, 897 (Minn. 1994); *Kloss v. E & H Earthmovers,* 472 N.W.2d 109, 112 (Minn.1991).

■ Section 122.4(i) provides in relevant part:

No permit may be issued: ... [t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards. The owner or operator of a new source or new discharger proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards even after the application of the effluent limitations required by [Section 301(b) ] of [the] CWA,[2] and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged, must demonstrate, before the close of the public comment period, that:

(1) There are sufficient remaining pollutant load allocations to allow for the discharge; and

(2) The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.

40 C.F.R. § 122.4(i). Two basic propositions may be derived from the regulation. One is that a new source cannot discharge if it will contribute to the violation of water-quality standards. The other is that, when a new discharge is proposed and a TMDL has been established, the proponent must demonstrate that the discharge complies with the TMDL.

MCEA argues initially that the regulation requires a TMDL to be established

2. This portion of the Clean Water Act imposes timetables for the implementation of best-technology practices for the removal of pollutants from discharge sources. It does not establish quantitative limits on water quality. 33 U.S.C. § 1311(b) (2000).

before a permit may issue. This position is contrary to the plain language of the regulation. When a TMDL has not been established, a new source is not required to demonstrate compliance with the TMDL. Rather, the opening sentence of 40 C.F.R. § 122.4(i) provides that a permit may be issued provided that the new source does not "cause or contribute to the violation of water quality standards." The remainder of section 122.4(i) addresses the criteria for issuing a permit when a TMDL has been established. Because the PCA has not yet established TMDLs for the affected waters, this portion of section 122.4(i) is not applicable.

Our construction of 40 C.F.R. § 122.4(i) comports with the only published authority to discuss the effect of the regulation in the absence of a TMDL. In *Crutchfield v. State Water Control Bd.*, 45 Va.App. 546, 612 S.E.2d 249, 251 (2005), a county applied for a permit for its proposed wastewater-treatment plant, which would discharge into a river with a Section 303(d) listing for insufficient dissolved oxygen. As here, a TMDL had not yet been established for the river. *Id.* at 255. The agency determined that the proposed discharge would not contribute to insufficient dissolved-oxygen levels in the river. *Id.* at 253–54. Applying a state regulation that incorporates 40 C.F.R. § 122.4(i), the *Crutchfield* court concurred with the determination that the discharge will not "cause or contribute to the violation of water quality standards" and upheld the issuance of a permit. *Id.* at 255.

■ In reaching its decision, the *Crutchfield* court addressed the same argument advanced here, that a permit could not issue in the absence of a TMDL for the river. Because the latter portion of the regulation governs only new sources that "discharge into a water segment which does not meet applicable water quality standards ... *and* for which the [State] has performed a pollutants load allocation," the *Crutchfield* court held that this requirement did not attach until a TMDL was established. *Id.* at 255 (emphasis added). Thus, as we conclude here, in the absence of a TMDL, a permit may issue to a new source that does not otherwise cause or contribute to an impairment of waters with impaired status.

MCEA counters that the meaning of the phrase "water quality standards," as recited in the first sentence of the regulation, must be determined in accordance with a TMDL. But in first determining whether waters receive a Section 303(d) listing, water-quality standards other than a TMDL are necessarily employed. *See* 33 U.S.C. § 1313(c) (2000) (referring to procedure for adopting and revising water-quality standards). We are without legal authority to conclude that the EPA intended the phrases "water quality standards" and "pollutants load allocation" to be synonymous, absent explicit definitions to that effect or the use of an identical phrase to convey both concepts. Accordingly, a TMDL is not required in order to determine whether a new discharge source will cause or contribute to the violation of water-quality standards under 40 C.F.R. § 122.4(i).

Here, the PCA found that discharge from the Cities' proposed plant would not affect dissolved-oxygen levels on the impaired portion of the North Fork.[3] We conclude that the PCA was not barred as a matter of law from issuing a permit because of the impact of the Cities' proposed

---

**3.** Because we reverse on other grounds, we do not address the argument by MCEA that the PCA's findings on dissolved-oxygen levels

in the North Fork were not supported by substantial evidence.

plant on dissolved-oxygen levels in the North Fork.

MCEA next challenges the conclusion of the PCA that phosphorus in the proposed discharge will not cause or contribute to the excessive nutrient impairment of Lake Pepin. The PCA found that the proposed plant will increase the annual phosphorus discharge into the North Fork from 1,400 to 3,600 pounds. Because it does not break down into smaller components, phosphorus persists in a watershed to a greater degree than other pollutants. Thus, the PCA concedes that this phosphorus will affect the Lake Pepin watershed. But the PCA asserts that, because of a reduced phosphorus discharge from other sources, the proposed plant will not contribute to higher phosphorus levels.[4] This reduced discharge from other sources, however, does not rectify the violation of water-quality standards.

We note that a system of offsets akin to the rationale offered by the PCA was proposed by the Environmental Protection Agency (EPA) five years ago when it last considered revisions to 40 C.F.R. § 122.4(i). Revisions to the Water Quality Planning and Management Regulation & to the NPDES Program, 65 Fed.Reg. 43,-586, 43,639 (proposed July 13, 2000). But this proposal was essentially rejected as unworkable. Id. at 43,640. The EPA noted:

> EPA also concluded that the additional environmental benefits from the offset requirement, in many cases, would have been minimal at best.... The offset requirement would have been a requirement over and above the requirements under current NPDES permitting regulations at [§ 122.4(i) ] .... For those dischargers who would have been subject to the offset requirement, consistent implementation of [these regulations] following existing EPA guidance would result in permits, if issued, containing limits and conditions for the pollutants of concern that derive from and comply with applicable water quality standards.... EPA believes that progress toward the attainment of water quality standards prior to a TMDL would be achieved through consistent implementation of EPA's existing regulatory authorities.

Id. at 43,641. Were we to assume that the language in 40 C.F.R. § 122.4(i) is ambiguous, this statement by the EPA, which was not proffered by the agency during litigation, demonstrates that the regulation is not intended to incorporate a system of offsets.[5] Nor is there any indication that a

---

4. In support of this interpretation of 40 C.F.R. § 122.4(i), the PCA relies on an interpretation of the regulation that the Environmental Protection Agency (EPA) submitted in a brief to federal district court. See Sierra Club v. Clifford, 1999 WL 33494861 (E.D.La. Oct.1, 1999). Where an agency's representations in the course of litigation are not based on its previous decisions or administrative practice, and thereby lack a sound basis, the representations cannot be used to determine the meaning of a regulation because they may constitute a rationalization after the fact. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988); Nat'l Wildlife Fed'n v. Browner, 127 F.3d 1126, 1129–30 (D.C.Cir.1997). Be-cause the EPA's brief does not reference any preexisting ruling or practice with respect to 40 C.F.R. § 122.4(i), we conclude that the brief does not meaningfully inform our interpretation of the regulation here.

5. The dissent correctly observes that the proposed system of offsets would have required all new sources to obtain offsets from other sources. But the EPA did not mention or endorse the discretionary application of a system of offsets. Rather, the EPA focused on the execution of TMDLs and the reduction of pollutants from each individual source. See Revisions to the Water Quality Planning and Management Regulation & to the NPDES Program, 65 Fed.Reg. at 43,641–42.

discretionary system of offsets is authorized.

■ A plain reading of the phrase "cause or contribute to the violation of water quality standards" indicates that, so long as some level of discharge may be causally attributed to the impairment of Section 303(d) waters, a permit shall not be issued. Here, the record demonstrates that, notwithstanding the reduction in phosphorus resulting from other sources, the waters at issue remain impaired. And the amount of phosphorus discharged into the North Fork from the proposed wastewater-treatment plant, which is more than double the current phosphorus level of 1,400 pounds per year, will contribute to impaired nutrient levels in Lake Pepin. We, therefore, conclude that the PCA erred as a matter of law when it issued a permit for the Cities' proposed plant.

In doing so, we reject the PCA's argument that, if 40 C.F.R. § 122.4(i) is interpreted to disallow issuance of the Cities' permit, the result would be the "complete ban" that the United States Supreme Court cautioned against in *Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). *See generally* Dianne K. Conway, *TMDL Litigation: So Now What?*, 17 Va. Envtl. L.J. 83, 117–18 (1997). The *Arkansas* case involved the availability of an NPDES permit for a municipal discharge source in the state of Arkansas. 503 U.S. at 95, 112 S.Ct. at 1057. The proposed discharge would flow into a river designated as a scenic waterway by the state of Oklahoma. *Id.* at 95 & n. 2, 112 S.Ct. at 1051 & n. 2. Under the scenic-waterway designation, Oklahoma's anti-degradation laws barred any source that would contribute to the violation of water-quality standards in the river. *Id.* The Tenth Circuit determined that, at the time the permit was proposed, the water quality of the river also was in violation of

Oklahoma's anti-degradation standards. *Id.* at 108, 112 S.Ct. at 1058.

Even though an Administrative Law Judge (ALJ) concluded that the proposed discharge would have no measurable effect on the scenic waterway, the Tenth Circuit disallowed the permit. *Id.* at 97–98, 112 S.Ct. at 1052. The Tenth Circuit relied exclusively on Section 402(h) of the Clean Water Act, which provides that when a municipal discharge source violates the terms of an NPDES permit, the EPA or a state environmental agency may seek to restrict or prohibit discharge from that source. 33 U.S.C. § 1342(h) (2000). Determining that the proposed discharge would violate Oklahoma's anti-degradation laws, the Tenth Circuit held that the Clean Water Act necessarily barred issuance of the permit. *Oklahoma v. Envtl. Prot. Agency*, 908 F.2d 595, 633–34 (10th Cir. 1990).

The United States Supreme Court reversed the decision of the Tenth Circuit and reinstated the permit. Even though the water quality of the river was in violation of state anti-degradation standards, the *Arkansas* court did not observe any legal impediments to the issuance of a permit:

> Although the Act contains several provisions directing compliance with state water quality standards, the parties have pointed to nothing that mandates a complete ban on discharges into a waterway that is in violation of those [state] standards.... Thus, rather than establishing the categorical ban announced by the Court of Appeals—which might frustrate the construction of new plants that would improve existing conditions—the Clean Water Act vests in the EPA and the States broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution.

*Arkansas,* 503 U.S. at 108, 112 S.Ct. at 1058 (citations omitted). The *Arkansas* court upheld the determination of the ALJ that the proposed discharge would not measurably affect the quality of water in the river. *Id.* at 111–12, 112 S.Ct. at 1059–60.

*Arkansas* is distinguishable in several respects from the instant case. The ALJ in *Arkansas* determined that the proposed source had no measurable impact on the scenic waterway. Here, the PCA determined that the Cities' proposed source has a measurable impact on the Section 303(d) impairment factors for the North Fork and the Lake Pepin watershed. *Arkansas* also did not consider Section 303(d) or its attendant regulations for the issuance of permits, such as 40 C.F.R. § 122.4(i). Instead, *Arkansas* addressed Section 402(h), which governs sanctions against certain existing permit holders.

Even though we conclude that 40 C.F.R. § 122.4(i) does not allow a permit to be issued here, our decision does not preclude permits to be issued in the future. The PCA implicitly suggests that every proposed discharge source would contribute to the impairment of Section 303(d) waters, but neither the record nor existing precedent supports such a broad conclusion. *See Arkansas,* 503 U.S. at 95–96, 112 S.Ct. at 1051 (observing that proposed discharge would not affect downstream water-quality standards); *Crutchfield,* 612 S.E.2d at 255 (authorizing permit when proposed discharge had no measurable impact on impaired waters). We are mindful of the difficult wastewater-management issues arising from the Cities' current size and anticipated growth. The Cities' joint effort to resolve these issues is laudable. But neither the difficulty of the issues nor the commendable effort authorizes a resolution that clearly violates the plain language of the regulations governing impaired waterways.

## DECISION

Because the discharge from the Cities' proposed plant would contribute to the impairment of Section 303(d) waters, the PCA erred by issuing a permit in violation of 40 C.F.R. § 122.4(i) (2004).

**Reversed.**

ROBERT H. SCHUMACHER, Judge (dissenting).

I respectfully dissent. I agree with the majority that 40 C.F.R. § 122.4(i) (2005) does not bar the Minnesota Pollution Control Agency (PCA) from issuing a permit in the period between the initial listing of a water body as impaired under section 303(d) of the Clean Water Act (CWA) and the implementation of a Total Maximum Daily Load. I also agree that the PCA was not barred as a matter of law from issuing a permit due to the impact of the proposed plant on dissolved oxygen levels in the North Fork of the Crow River.

But I disagree with the majority's conclusion that the PCA erred by interpreting 40 C.F.R. § 122.4(i) as authorizing it to issue the permit. I believe that when reviewed with the deference properly accorded agency actions on review by this court, the PCA's interpretation of the regulation and its decision to grant the permit were reasonable and consistent with the purposes and principles of the CWA. I would therefore affirm the PCA's decision.

The majority rejects the PCA's interpretation of section 122.4(i), which provides that no permit will issue if a new discharger will "cause or contribute to the violation of water quality standards." The PCA interpreted this provision as authorizing an additional annual phosphorus discharge of 2,200 pounds to the Lake Pepin watershed where agency findings showed

that this discharge will be offset by an annual reduction in phosphorus discharge in excess of 50,000 pounds to the same watershed from a new Litchfield wastewater plant.

The majority first declines to give deference to the PCA's interpretation of the regulation on the grounds that a state agency's construction of federal law presents a legal question, which this court reviews de novo. Although it is axiomatic that this court is free to exercise its independent judgment when reviewing questions of law, I believe that reviewing the PCA's interpretation de novo disregards the "fundamental concept that decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). The agency decision-maker is presumed to have the expertise necessary to decide technical matters within the scope of the agency's authority, *In re Special Instruction & Servs. for Pautz*, 295 N.W.2d 635, 637 (Minn.1980), and judicial deference, rooted in the separation of powers doctrine, is extended to an agency decision-maker in the interpretation of statutes that the agency is charged with administering and enforcing. *Krumm v. R.A. Nadeau Co.*, 276 N.W.2d 641, 644 (Minn.1979); *In re Max Schwartzman & Sons, Inc.*, 670 N.W.2d 746, 754 (Minn.App.2003).

The PCA is charged by state and federal law with administering the CWA and its attendant regulations. 40 C.F.R. § 123.25(a)(1); Minn.Stat. § 115.03, subd. 1(a), (e) (2004). And I cannot agree with the majority's implication that an agency's interpretation of a federal regulation it administers is entitled to less deference than its interpretation of a state regulation

it administers. Therefore, in recognition of the "need for exercising judicial restraint and for restricting judicial functions to a narrow area of responsibility, lest [we] substitute [our] judgment for that of the agency," *Reserve Mining Co.*, 256 N.W.2d at 824, I would review the PCA's interpretation of the regulation under a reasonableness standard. *See In re Univ. of Minn.*, 566 N.W.2d 98, 103 (Minn.App. 1997) (stating that "when an agency reasonably interprets a statute, it is the role of the legislature or the supreme court, and not the role of this court, to overrule that interpretation").

The majority also declines to defer to the PCA's interpretation of the regulation because it is based upon an Environmental Protection Agency (EPA) interpretation submitted in a brief to federal district court. Because the "cause or contribute" language at issue here is reasonably susceptible to different interpretations—as evidenced by the meritorious opposing constructions advanced by both parties— the EPA's interpretation would typically be entitled to "considerable deference." *St. Otto's Home v. Minnesota Dept. of Human Servs.*, 437 N.W.2d 35, 40 (Minn. 1989). The majority states that "[w]here an agency's representations in the course of litigation are not based on its previous decisions or administrative practice, and thereby lack a sound basis, the representations cannot be used to determine the meaning of a regulation, because they may constitute a rationalization after the fact," relying upon *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988), and *Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129–30 (D.C.Cir.1997).

But *Bowen* does not categorically reject agency litigating positions as interpretive guides; it only states that courts should not defer to those positions where they

"are wholly unsupported by regulations, rulings, or administrative practice ... [or] where the agency itself has articulated no position on the question." 488 U.S. at 212, 109 S.Ct. at 473–74. In *Browner*, the court in fact *rejected* as "unpersuasive" the "contention that the court should not defer to EPA's interpretation of [a] regulation because it is no more than a convenient litigating position," observing that the "mere fact that an agency offers its interpretation in the course of litigation does not automatically preclude deference to the agency." 127 F.3d at 1129 (quotation omitted). The court stated that although "agency litigating positions are not entitled to deference when they are merely appellate counsel's post hoc rationalizations for agency action, advanced for the first time in the reviewing court ... deference to an interpretation offered in the course of litigation is still proper as long as it reflects 'the agency's fair and considered judgment on the matter.'" *Id.* (quoting *Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997)).

The EPA brief upon which the PCA relies here describes the offset system as an agency "practice," and, as the majority observes, the EPA itself proposed a rule requiring offsets when it last considered revisions to section 122.4(i) in 2000. Because the record demonstrates that the EPA's litigation position reflected an administrative practice, and was not a post hoc rationalization advanced for the first time on appeal, I do not believe that *Bowen* and *Browner* preclude the PCA's reliance upon the EPA's brief in interpreting section 122.4(i).

Finally, the majority discounts the PCA's interpretation of the regulation because in 2000, the EPA considered and rejected a proposed "system of offsets akin to the rationale offered by the PCA." For two reasons, I do not believe the EPA's

earlier action compels the conclusion that the PCA may not interpret the regulation as permitting offsets here. First, the 2000 proposal would have *required* new dischargers nationwide to offset new-pollutant loading by "securing reductions in the loading of the same pollutant from an existing source(s) located on the same waterbody." *Revisions to the Water Quality Planning Regulation & NPDES Program*, 65 Fed.Reg. 43586, 43639 (E.P.A. July 13, 2000). The EPA rejected the proposal as practically "unworkable" both because of the likely impossibility of always finding a source in a given waterbody "from which an offset might be obtained" and because a national-scale, "one size fits all" approach to regulation would "undercut State primacy in determining what actions are necessary to attain water quality standards." *Id.* at 43639–40.

These problems are not present here. The offset source has already been identified and permitted, and the PCA is acting in the state's interest to improve water quality, not in compliance with a federal mandate. I do not believe the EPA's earlier rejection of the offsets requirement is dispositive as to the PCA's interpretation of the regulation. Second, I do not believe that the EPA's choice not to mandate an offset system bars the PCA from considering the effect of the Litchfield offset in determining whether to grant the permit at issue.

The majority contends that a "plain reading of the phrase 'cause or contribute to the violation of water quality standards' indicates that, so long as some level of discharge may be causally attributed to the impairment of Section 303(d) waters, a permit shall not be issued." Because I feel this approach will effectively preclude issuance of a permit prior to completion of a TMDL, I believe it frustrates the purposes of the CWA and prevents the PCA

from exercising its authority to take necessary action to ameliorate water quality in the meantime. *See Arkansas v. Oklahoma*, 503 U.S. 91, 107, 112 S.Ct. 1046, 1057, 117 L.Ed.2d 239 (1992) (rejecting, as supported by "nothing in the Act," interpreting CWA "to prohibit any discharge of effluent that would reach waters already in violation of existing water quality standards"). I would give deference to the PCA's interpretation of the regulation and affirm its decision to issue the permit.